JAMES ROSS, MARGARET MASSY, WALTER W. ROSS, JOHN
   M. Ross and SUSAN HARDY, Contestants, Appellants,
   v. ROBERT ROSS and BOYSON ROSS, Proponents, Ap-
   pellees.

**Wills:** COMPETENCY OF ATTORNEY AS A WITNESS. An attorney for the
proponents of a will is competent to testify in their behalf in
regard to the drawing of a prior will for testator, and to the cir-
cumstances connected with its execution; his relationship to the
proponents being material only as affecting the weight to be
given his testimony.

**Incompetent evidence:** MOTION TO STRIKE. Matters which are sought
to be injected into the record on cross-examination by nonre-
sponsive answers should be stricken on motion, especially where
the subject matter of the testimony cannot be elicited from the
witness because relating to a communication with one since
deceased.

**Same:** REDIRECT EXAMINATION. A witness who is by statute incom-
petent to testify to certain facts on direct examination cannot
be interrogated concerning such facts on redirect.

**Wills:** BURDEN OF PROOF: PHYSICAL INFIRMITY OF TESTATOR: INSTRUC-
TIONS. The only burden resting upon the proponents of a will
in the first instance is to show its due execution and attesta-
tion; and while it is proper for contestants to show testator's
defective eyesight or any other mental or physical impairment
for the purpose of establishing incapacity, fraud or undue influ-
ence, and that testator did not understand the contents of the
instrument he was signing, still these things are not important in
making a *prima facie* case for proponents, nor do they change
the rule as to the burden of proof in that particular.

**Wills:** DISCRIMINATION AMONG HEIRS: UNSOUNDNESS OF MIND: IN-
STRUCTION. If a testator of sound mind had formed a dislike
and ill-will toward some of his children and for that reason
discriminated against them in his will, the fact that he was mis-
taken in his judgment and arrived at a wrong conclusion would
not invalidate the will, but the same should be considered on an
issue involving his unsoundness of mind.

**Mental incapacity:** UNDUE INFLUENCE: EVIDENCE: INSTRUCTION. An
6 instruction that neither the testator's age nor the character or
extent of his property are evidence of mental infirmity or undue
influence was proper, especially when considered with another
instruction that unless the will was fairly made, emanated from
a free will and accorded with testator's intentions previously
declared it ought not to be upheld.

**Will contest:** UNDUE INFLUENCE: UNSOUNDNESS OF MIND: EVIDENCE.
7 On the questions of undue influence and unsoundness of tes-
tator's mind the evidence is reviewed and found to be in con-
flict, but amply sufficient to support a verdict for proponents and
is not disturbed, especially as the trial court added a like conclu-
sion by overruling a motion for new trial.

*Appeal from Plymouth District Court.*—HON. WM.
HUTCHINSON, Judge.

THURSDAY, OCTOBER 29, 1908.

THIS is a contest over the will of Duncan Ross, de-
ceased. It is claimed that testator was unsound of mind
when he made the will, and that the same was the result
of fraud and undue influence exercised by Boyson and
Robert Ross and other persons unknown. Defendants are
beneficiaries under the will, and they were also named as
executors, and as such they offered the will for probate.
Under the issues joined the case was submitted to a jury,
resulting in a verdict and judgment for proponents and
an order admitting the will to probate. Contestants ap-
peal. *Affirmed.*

*McDuffie & Keenan* and *F. W. Sargent,* for appellants.

*Shull, Farnsworth & Sammis* and *E. C. Ericson,* for
appellees.

DEEMER, J.—Duncan Ross died in Plymouth County,
Iowa, April 21, 1906, having made what purported to

be his last will and testament on the 6th day of January, 1905. He was something like ninety-five years of age when he died, and left surviving five sons, James, Boyson, Robert, Walter. W., and John M. Ross, and two daughters, Margaret Massey and Susan Hardy. Jessie Ross, another daughter, who married one Smith, died many years before testator's death, leaving a large family of children. Dan Ross, another son, died unmarried in the year 1871, and Duncan Ross, Jr., another son, died before the testator, leaving nine children surviving. By the terms of the will deceased devised to his sons Boyson and Robert property valued at $57,000, and some other property, the value of which is not shown. To his son Walter he devised one hundred and sixty acres of land worth something like $9,600; to his son, John M. Ross, and his daughter, Susan Hardy, he devised property worth $9,900, and to the nine children of his son, Duncan, Jr., he devised land worth about $4,000. To his sons Boyson and Robert he bequeathed personal property amounting to $14,000 to each; to John M. Ross and Susan Hardy each $6,000. To James Ross and the nine children of Duncan, Jr., he bequeathed each the sum of $10. To the children of his deceased daughter, Jessie Smith, and to Margaret Massey he bequeathed the sum of $1. The residue of his estate, both real and personal, he devised and bequeathed in equal portions to his children Boyson, Robert, and John M. Ross and Susan Hardy. The value of deceased's entire estate was approximately $120,000. Robert and Boyson Ross were named as executors, and as such filed the will for probate. Contestants named in the caption filed objections to the probate of the will, the material parts of which read as follows: "First, said pretended will was not executed and published by said Duncan Ross; second, that at the date of the pretended execution of said will the said Duncan Ross was of unsound mind, and mentally and physically incapacitated to make a valid will; third, that

said pretended will was procured and executed through fraud, duress, and undue influence, exercised upon said decedent by the defendants, Boyson Ross and Robert Ross, and other persons whose names are at the present time unknown to plaintiffs, and so contestants aver that said paper is not the valid will of said decedent, Duncan Ross, and should not be admitted to probate." Two trials were had of the issues so tendered, the first resulting in a disagreement of the jury, and the second in a verdict for proponents, and the will was duly admitted to probate. For some years prior to his demise Duncan Ross had suffered from a cancer of the heel, which finally resulted in his death. And it is claimed that at the time of the making of the will testator was afflicted with *senile dementia,* and was mentally incapacitated from making a valid will. It is also contended that the will was the result of undue influence exercised by Boyson and Robert Ross and others, and that the same was obtained through fraud practiced upon him. The appeal challenges certain rulings of the trial court on the admission and rejection of testimony, certain of the instructions given to the jury, the ruling on the motion for a new trial, and also the sufficiency of the testimony to support the verdict. To such of these matters as are deemed important we shall now give attention.

E. C. Ericson, one of the proponents' attorneys, took the witness stand on behalf of his clients, and over contestants' objections was permitted to testify regarding the

1. WILLS: competency of attorney as a witness.

writing of a will for Duncan Ross in the year 1903, and the circumstances connected with the execution of the will. In this there was no error. The fact that he was then, or had theretofore been, of counsel for proponents was a matter to be considered by the jury; but such fact did not render the witness incompetent. *Alger v. Merritt,* 16 Iowa, 121.

Walter Ross, one of the contestants, was a witness on

his own behalf, and on cross-examination by proponents'
counsel he was asked what the agreement was between him-
self and the deceased regarding the rent
2. INCOMPETENT
   EVIDENCE: mo-      he was to pay for what was known as the
   tion to strike.
"Wamsley Farm," to which the witness an-
swered: "Well, I might say I went to him and told him
if he would rent it to me for three or five years, at the
same terms I had it before, for five hundred and fifty, that
I would break it up and get it into shape to farm. 'Why,'
he says, 'I will have to have more than that,' but he says,
'You stay there, and do the right thing with me, and see
that I get my share out of these other farms,' he said, 'and
I will do the right thing with you while you stay on this
farm, and when I am done with it, it will be yours.' And
so when I got ready to—" Here the witness was inter-
rupted, and on motion of defendants' counsel the answer,
so far as it related to what the father told him, was stricken
out, because incompetent under the statute, and not re-
sponsive to the question. This ruling was clearly within
the discretion of the trial court, and was not prejudicially
erroneous. If a witness on cross-examination attempts to
inject matters into the case through answers which are not
responsive to an interrogatory, the matter should be stricken
on motion; and, if the trial court strikes such matter out,
the other side has no right to complain, especially where,
as here, the subject-matter of the testimony cannot be
elicited from the witness because of some statutory inhibi-
tion. This witness, being interested and a party to the
case, could not give any testimony as to any personal com-
munication or transaction with his father, now deceased,
for the action is against the executors under the will. See
Code, section 4604, and annotations thereunder. After the
cross-examination had closed, contestant attempted to bring
out the same matter on re-examination, but was prevented
from so doing by the trial court's ruling sustaining objec-
tions to the questions propounded. In view of the ruling

made on the cross-examination of the witness, it is manifest that there was no error here. The matter inquired about was not proper re-examination, and contestants could not offer such testimony in the first instance by reason of the provisions of the statute referred to.

Contestants also asked their witness on re-examination as to whether his father talked intelligently and understandingly about his business matters in his dealings with 4. SAME: redirect examination. him, and also as to the various subjects upon which his father talked, the manner and method in which he carried on his conversations, etc. Objections to these questions as not proper re-examination, and as incompetent were sustained. In this there was no error of which contestants may properly complain. The trial court has a large discretion in rulings on objections to questions as being not re-examination. The testimony was not offered in chief, and if it had been, it would have been objectionable, for reasons already stated. There was no prejudicial error in rulings on the admission and rejection of testimony.

II. The trial court gave these as its fourth, fifth, and sixth instructions:

Par. 4. The statute of this State provides that any person of full age and sound mind may dispose by will of all his property except what is sufficient to pay his debts, or what is allowed as a homestead, or otherwise given by law as privileged property to his wife and family. That the will must be witnessed by two competent witnesses, signed by the testator, or by some person in his presence and by his express direction, and must be in writing. You are instructed therefore that the burden of proof in the first place rests upon the proponents, that is, the parties seeking to have the will established, to show by the evidence that at the time of the execution of the will in question the testator, Duncan Ross, was of sound mind, that he signed said instrument as, and for, his last will and testament, and that such will was witnessed by two

competent witnesses; and it is primarily sufficient if the statute is shown to have been substantially complied with in this respect.

Par. 5. If the proponents have therefore satisfied you that the instrument in evidence, marked 'Exhibit A,' is the last will and testament of Duncan Ross, and that he executed the same, and that at the time of the execution thereof he was of sound mind, and that he signed the instrument as and for his last will and testament, and that he signed the same in the presence of two or more competent witnesses, and that the signing and execution thereof was witnessed by two or more competent witnesses, or that it was signed by some person in the presence of the testator and by his express direction, and that the persons so witnessing the signing of the will by the testator signed the same as witnesses, in the presence of the testator and in the presence of each other, then you should find the will to be the last will and testament of the testator, and that the same should be admitted to probate in this court, and say so by your verdict.

Par. 6. The contestants claim that at the time the will was executed by said Duncan Ross, if the same was executed by him, he was of unsound mind and mentally incapacitated to make a valid will, and that the same was procured by fraud or undue influence. Now on this question you are instructed that the burden of proof rests upon the contestants, and that they must establish this claim by a preponderance of the evidence before they can defeat the will on these grounds, or either of them. If the contestants have satisfied you, as aforesaid, that the testator at the time of the making of the will was of unsound mind; that he was not in possession of his mental faculties so as to comprehend the effect and nature of the instrument, and to be able to make disposition of his property with understanding and reason; or if you find that the instrument purporting to be the last will of the said Duncan Ross was caused to be executed by fraud or undue influence— then you should find the instrument invalid as a will, and that the same is not the last will and testament of the said Duncan Ross.

The fourth and the fifth are challenged on these

grounds: It appears from the testimony that at the time
the will was executed testator's eyesight was so impaired

4. WILLS: bur-
den of proof:
physical
infirmity of
testator: in-
structions.

that he could not read the instrument, and
it is claimed that it was incumbent on the
proponents to show, in addition to the mat-
ters mentioned in the instructions, that the
will was read over to the testator, or that he was in some
manner informed of its contents. It is also contended that
the sixth instruction was erroneous, for the reason that it,
in effect, withdrew from the consideration of the jury the
defective condition of testator's eyesight, which matter
should have been considered on the issue of his capacity
to make a valid will. It is further argued that instruction
six is also erroneous because it cast the burden on the con-
testants to prove that deceased was unsound of mind at
the time he made the will. Abstractly considered, the in-
structions are undoubtedly correct. The only burden rest-
ing on proponents in the first instance was to show the due
execution and attestation of the will. *Mallow v. Walker,*
115 Iowa, 238; *Marshall v. Hanby,* 115 Iowa, 318;
*Fothergill v. Fothergill,* 129 Iowa, 93; *Parker v. Lam-
bertz,* 128 Iowa, 496.

The only question left in this connection is, does the
fact of testator's impairment of sight change the rule?
Both reason and authority call for a negative answer to
this proposition. It was undoubtedly competent for con-
testants to show defective eyesight, or any other mental
or physical impairment, as bearing upon the issues of
mental incapacity, fraud, and undue influence, and for
the purpose of showing that decedent did not know or
understand the contents of the instrument he was signing
as and for a last will and testament, and the trial court
so instructed in the other paragraphs of its charge. But
as bearing upon the matters which proponents were re-
quired to establish to make out a *prima facie* case, this
impairment of the sense of sight was not important, nor

does this fact change the rule as to the burden· of proof. If the will was executed according to the formalities required by law, the presumption in the first instance is that it was read to testator, or that he was otherwise acquainted with its provisions.   The testimony shows beyond all question that the instrument ·was signed by the testator in person, and it bears upon its face evidence of proper attestation.   This matter is fully covered in 1 Underhill on Wills, sections 18-141.   See, also, *In re Smith's Will* (Sur.), 24 N. Y. Supp. 928; *In re Crumb's Will* (Sur.), 2 N. Y. Supp. 744.   Underhill says: "It is a fair presumption, recognized by the law, that if a man of ·intelligence executes with due formalities an instrument of so solemn a nature as a will, he knows its contents.   This presumption is strengthened, and in the absence of rebutting. facts rendered conclusive, by evidence that the language of the paper which is offered as his will agrees, in substance, with the instructions given by the testator."   In the *Smith* case, *supra,* the court said:   "It · is not to be presumed that a man of prudence and care affixed his mark to an instrument, and made a declaration as to what that instrument was, without knowledge of its contents.   If any presumption is to be indulged, it is that he knew the contents of the paper.   All the requirements of the statute as to the execution of the instrument were fully complied with, and this court cannot add another that, because of his lack of education, it must be·made to appear that the instrument was read to him."   The trial court did not withdraw from the jury the testimony regarding decedent's defective eyesight.   That matter was submitted by the seventeenth paragraph of the instructions.   As further sustaining our conclusions, see, *In re Hull's Will,* 117 Iowa, 738; Page on Wills, sections 371-375.

III.   The tenth instruction given by the trial court reads as follows:   "If you find from the evidence in this

case that the testator bore some ill-will or dislike towards one or more of his children, you are instructed that, if the testator was influenced thereby to make his will as he did, and at the time was of sound mind, and did so of his own free choice, his will would be valid, and should be recognized by you. Even if he did it unjustly, or with mistaken opinion as to the matters involved, this would not invalidate the will, but would rather tend to explain why he made his will as he did." It is claimed that in this, and especially the last paragraph, the trial court invaded the province of the jury. We do not so construe the instruction. The last paragraph is predicated upon the proposition that testator was of sound mind and freely and of choice made the will as it appears. It is suggested in conclusion that, even if the provisions of the will so made were unjust, or if testator's feelings were without foundation, this would not invalidate the will, but rather tend to explain why he made it as he did. The statement is largely argumentative and might well have been left to the jury, yet there was no prejudicial error in the instruction, for it states what might well be termed an "axiomatic truth." If testator, while sound of mind, formed a dislike toward certain of his children, and entertained an ill-will regarding them, and for this reason freely and of choice disinherited them, the fact that he was mistaken in his judgment or arrived at unjust conclusions would not invalidate the will; and, as the court said, this would tend to explain why he made the will as he did. Of course, unfounded ill-will or dislike, like other faulty conclusions or processes of ratiocination, should be considered as bearing upon the issue of unsoundness of mind. The instruction does not in any manner conflict with this proposition. Much was made of testator's dislike of and ill-will toward certain of his cildren, and the trial court did not err in submitting the somewhat argumentative proposition involved

<div style="margin-left:2em">5. WILLS: discrimination among heirs: unsoundness of mind: instruction.</div>

in the tenth instruction. That the unjust or unnatural disposition of the property by a testator may be considered upon issues such as were tendered in this case is conceded. But it is also true that this may be explained, and when it appears that it grew out of ill-will or dislike for particular children, these facts may be considered as explaining the apparent discriminations made as between his children. If these were not the product of a disordered mind, they account for the disposition made of the property, or, as the trial court said, tend to explain "why he made the will as he did."

IV. The latter part of the eleventh instruction reads as follows: "You are further instructed that, in determining the question submitted to you as to the mental capacity 6. MENTAL IN-CAPACITY: undue influence: evidence: instruction. of the testator at the time of the execution of the will in question, and in determining the question of undue influence, that neither his age nor the character and extent of his property is to be considered as evidence of incapacity on the testator's part, or of undue influence on the part of the proponents." This is said to run counter to *In re Ames' Will,* 51 Iowa, 596, and *Owen v. Owen,* 22 Iowa, 270. Neither of these cases condemn the instruction quoted. On the contrary, the *Ames* case sustained the sixteenth instruction given by the court, which should be considered in this connection, reading as follows: "You are instructed that, if you find from the evidence that the testator, Duncan Ross, was aged and of impaired mind and memory; that although he may not have been legally incompetent to make a will, yet the will of such a person ought not to be sustained, unless it appears that such disposition of his property has been fairly made, to have emanated from a free will without the interposition of others, and to accord to intentions previously expressed or implied from family relations, and in this case if you find from the evidence that the testator was over ninety years of age, with im-

paired mind and memory, and, although you may find he had sufficient mental capacity to make a will, yet, if from the evidence you believe that a disposition of his property has been made which is unfair to his legal representatives; that such disposition did not emanate from a free will, and is not in accord with the testator's previous intentions, either express or implied from the family relations—you will be justified in finding that it is not the voluntary and free will of the testator, and that such will was obtained by undue influence." The tenth instruction has support in Underhill on Wills, section 117, and *Slaughter v. McManigal,* 138 Iowa, 643. Neither testator's age nor the character or extent of his property is evidence of unsoundness of mind or undue influence. The instruction has direct support in *In re Wiltsey's Will,* 122 Iowa, 423; *Muir v. Miller,* 72 Iowa, 585; *Trotter v. Trotter,* 117 Iowa, 417. The matters referred to, taken in connection with other facts and circumstances, might be considered on some of the issues joined, but standing alone they amount to nothing. *Trotter v. Trotter, supra.* Other instructions given by the court presented this thought, and there was no error in the instructions complained of.

V. Concluding the argument with reference to the instructions, appellants' counsel contend that some of them are conflicting and others misleading. We have read them over with care, and without setting them forth in *haec verba,* it is sufficient to say that we discover no such errors.

VI. The last proposition relied upon by appellants' counsel, and the one on which they seem to rely with greatest confidence, is that the verdict is contrary to the evidence, and should have been for contestants. Many circumstances are pointed out which it is claimed show that decedent did not know, and could not have known or understood, the provisions of his will. Certain other testimony is relied upon as showing undue influence on the part of proponents,

7. WILL CON-
TEST: undue
influence: un-
soundness of
mind: evi-
dence.

and the testimony of three witnesses is especially relied upon as showing that testator was afflicted with *senile dementia* at the time it is claimed he made his will. If this were all the testimony, we should have no difficulty in arriving at the conclusion which appellants' counsel would have us draw. But there was another side to the case. The testimony for proponents, coming from many witnesses and directed to all the issues in the case, raised such a conflict in the evidence, and in the inferences. to be derived therefrom, as to present questions of fact for a jury, and with its finding we should not interfere. It is true that deceased, more than twenty-five years before he executed his will, acquired a dislike for his son James so violent that he would not speak to him, and that for a number of years prior to the making of his will he bore ill-will toward Mrs. Massey's husband, and that he said to various persons that he would not give his daughter, Mrs. Massey, any of his property. When he incurred these dispositions it is conceded that he was of sound mind. They were not the product of a diseased mind, but rather the result of a Scotch opinion regarding the duties of children toward their parents, and a dogged determination common to many of Scotch blood. He is shown to have been a man of decided convictions and tenacious opinions. The difference between testator and his son arose over the disposition of the property left by Daniel Ross, and it does not appear that James ever did anything to heal the breach. Indeed, he seems to have inherited his father's disposition, and was quite as stubborn as his parent. The trouble with the Masseys arose over the arrest of Duncan Ross, Jr. It was believed by testator that Massey was responsible for this, and there seems to have been some foundation in testator's mind for this belief. At any rate, long before it is claimed testator became afflicted with mental infirmity, he declared that he would not give to James or to Mrs. Massey more than enough of his property to shut them out. This was

nine years before the execution of the will in controversy. The testimony shows that testator transacted business down to a very short time before his death, that he was close-mouthed, and rarely consulted others with reference to business transactions, and that no one transacted any of his business save under his directions. It is claimed that defendants, with the officers of a certain bank in which testator was interested, undertook to secure a will which would· place the control of the bank in proponents; but this is supported by nothing more than an inference which might or might not be drawn by a jury from the circumstances shown. We are not justified in coming to another conclusion on the testimony relating to this matter.

Not a witness for contestants gave it as his opinion that testator was unsound of mind. Three witnesses, however, did testify to such a state of facts as that some degree of mental infirmity might have been found by a jury. One of these witnesses, however, was constantly dealing with testator as if he were of sound mind, and accepting his bounty without question regarding his power to confer it. Counsel say that the testimony given by these witnesses is uncontradicted, and in a sense this is true, because no one disputed many of the transactions to which they had testified. But proponents did produce witnesses, both expert and nonexpert, who testified, not only to his condition of mind directly, but who narrated facts and circumstances that could only have emanated from a sound mind. This testimony covers a period down to within a few weeks of testator's death. This surely created a conflict upon the proposition as to testator's mental capacity. Contestants' testimony was not direct, but circumstantial, and from it the jury was asked a conclusion as to mental capacity. Against this was both direct and circumstantial evidence from which the jury was asked to arrive at a different conclusion. Surely this produced a conflict which the jury

was to settle, and, having returned a verdict for proponents, we are not justified in setting it aside.

Moreover, the trial court saw the witnesses and heard their testimony, and in overruling the motion for a new trial it added its conclusion to that of the jury, and the case is not such as to justify our interference. It is claimed, however, that until the will was made it was testator's intention to give what is known as the "Wamsley Farm" to his son Walter, one of the contestants, and that by his will he gave it to one of the proponents. There is testimony to the effect that he intended to give it to Walter, but there is also testimony to the effect that, if he ever so intended, he changed his mind, and before making the will concluded to give it to Boyson, one of the proponents. There is nothing in this circumstance to indicate either undue influence or unsoundness of mind. Again, it is said that the will bears internal evidence that the testator did not understand it, and that in his condition of mind he could not have been made to understand it. This was a fair question for the jury. The will was signed by testator, properly attested, and bears on its face every evidence of great care in its execution. As heretofore indicated in another branch of the opinion, this is presumptive evidence that it was fully understood, and was in fact decedent's last will and testament. Moreover, there is independent evidence showing that testator knew and fully appreciated all the terms of the will. At best this, too, was a jury question. We have read the evidence with care, not, of course, for the purpose of arriving at a conclusion for ourselves upon the testimony, but to ascertain whether or not the verdict has substantial support, and our conclusion is that it has ample support and should not be disturbed. It is not important for us to state what verdict we might have rendered were we sitting as jurors in the case. Counsel have in their argument assumed that we are here sitting as jurors, and that we should

now determine the questions at issue as we believe they should have been decided, without reference to the verdict of the jury. Aside from any other view of the case, it is enough to say that we have done our duty when we decide the legal questions involved, and solve the one other proposition that the verdict is so unjust and so at variance with the testimony adduced as to indicate passion or prejudice on the part of the jury.

We discover no prejudicial error in the record, and the judgment must be, and it is, *affirmed*.