McCARTY et al. v. WEATHERLY, Exec., et al.

No. 10381—Opinion Filed Jan. 17, 1922.

Rehearing Denied Feb. 28, 1922.

(Syllabus.)

1. Wills—Probate—Burden of Proof.

The burden of proof rests upon the proponents of a will to establish by a preponderance of the evidence that the will was executed and published according to the provisions of the statutes.

2. Same—Testimony of Subscribing Witnesses—Supplementary Evidence.

In a proceeding to probate a will, where the right to admit the will to probate is

contested, and the subscribing witnesses are produced in court to testify about the execution of the will, neither the recitals contained in the attesting clause of the will nor the ex parte affidavits of such subscribing witnesses are admissible, over the objections of the contestants, to prove the execution of the will, or supplement the parol testimony of such subscribing witnesses.

### 3. Same—Right to Cross-Examine Subscribing Witnesses.

Where the presence of such subscribing witness can be had in court, the opposing party has the right to cross-examine such witness upon all matters concerning which he testified in chief, and the same rules apply as in civil actions.

### 4. Wills—Execution—Declaration by Testator to Attesting Witnesses.

The testator must, at the time of subscribing or acknowledging the same, declare to the attesting witnesses that the instrument is his will (3rd paragraph of section 8348, Revised Laws of 1910).

### 5. Same—Nonholographic Wills.

The declaration of the testatrix to the attesting witnesses that the instrument is her will is an essential part of the execution of a nonholographic will.

### 6. Same—Probate—Failure of Proof.

Where a nonholographic will is offered for probate and the evidence fails to show that the testatrix declared or published the instrument as her will in the presence of the subscribing witnesses, the proponents have not established that the will was executed according to law, and the probate thereof should be denied.

### 7. Same—Undue Influence—Proof.

To establish undue influence it is not necessary that there be direct testimony that threats were made or even persistent entreaty or persuasion was brought to bear upon the mind of the testatrix. It is sufficient that if from all the surrounding circumstances connected with the making of the will it appears that any undue influence has been exercised, the court should not admit the will to probate.

### 8. Same.

In determining the question of undue influence, the court should take into consideration the association of the parties, the opportunity for undue influence afforded the person who is especially favored by the terms of the will, and the effect of the will upon those persons who we would naturally expect to be the recipients of her bounty. But opportunity for undue influence, standing alone, is not sufficient to establish undue influence.

### 9. Same.

The record examined, and held, that it does establish undue influence.

### 10. Same — Probate — Burden of Proof.

The burden of proof rests upon the proponents of a will to prove not only the due execution of the will as provided by law, but that the instrument was in fact the free and voluntary act and will of the testatrix.

Error from District Court, Pontotoc County; J. W. Bolen, Judge.

Proceeding instituted in the County Court by J. H. Weatherly for the probate of the will of Katsey McCarty, deceased. Petition objecting to the probate of the will filed by Somie McCarty et al. Will admitted to probate. Contestants appealed to the District Court. On a trial de novo the District Court admitted the will to probate. Contestants appealed. Reversed and remanded.

I. M. King, John P. Crawford, Tom D. McKeown, and W. F. Schulte, for plaintiffs in error.

Conway O. Barton and Clinton A. Galbraith, for defendants in error.

MILLER, J. This was a proceeding instituted in the county court of Pontotoc county by J. H. Weatherly filing a petition asking for the probate of the will of Katsey McCarty. The petition stated that Katsey McCarty departed this life in Pontotoc county, Okla., on or about the 26th day of September, 1916. That she left a will bearing date of February 14, 1916. That her estate consisted of 211.45 acres of land, being the homestead and surplus allotment of the decedent, the probable value of which was $4,000, household goods and effects to the value of $50, and cash to the amount of $200, in the hands of J. H. Weatherly, her guardian. That the heirs were two sons, Somie McCarty, age 37, and Tom McCarty, age 33; one daughter, Mary Cravatt, age 32; and one granddaughter, Alba James, age 18, by Nellie McCarty James, a deceased daughter of Katsey McCarty.

Attached to this petition were the separate affidavits of the three subscribing witnesses to the will. The will was approved by the county judge of Pontotoc county and is as follows:

"State of Oklahoma, County of Pontotoc—ss.

"Last Will and Testament of Katsey McCarty.

"I, Katsey McCarty, of Pontotoc county, state of Oklahoma, being now in good health, strength of body and mind, although totally blind, and being sensible of the uncertainty of life and desiring to make disposition of my property, and affairs, while in health and strength, do hereby make, publish and declare the following to be my last will

and testament, hereby revoking and canceling all other or former wills by me at any time made.

"(1) I direct the payment of all my just debts and funeral expenses.

"(2) I give and devise to my daughter Mary Cravatt the sum of ($1.00) one dollar.

"(3) I give and devise to my son Somie McCarty the sum of ($1.00) one dollar.

"(4) I give and devise to my granddaughter, Alma James, the sum of ($1.00) one dollar.

"To my son, Tom McCarty, I give and bequeath all the rest, residue and remainder of my property, both real and personal; the personal property consisting of a limited amount of household furniture and wearing apparel and cash on hand deposited in the bank by my guardian, J. H. Weatherly, and the real estate consisting of my entire allotment as a Chickasaw Indian by blood. Roll Number 787, including both homestead and surplus, and more particularly described as follows: (Here follows the description of the land.)

"(6) I hereby appoint and designate my guardian, J. H. Weatherly, my sole executor without bond, of this my last will and testment.

"In Witness Whereof, I, Katsey McCarty, have to this my last will and testament consisting of two sheets of paper, subscribed my name this the 14th day of February, 1916.

"Katsey (her X mark) McCarty.

"I signed the name of Katsey McCarty to the within and foregoing will, in her presence and at her request, after the same had been first read over and explained to her.              C. O. Barton.

"Subscribed by Katsey McCarty in the presence of each of us, the undersigned, and at the time declared by her to us to be her last will and testament, and we thereupon at the request of Katsey McCarty in her presence and the presence of each other sign our names hereto as witnesses this 14th day of February, 1916, at Ada, Oklahoma.

"R. J. Ross, Jr.,
"Jency Weatherly,
"Henry Daily."

The three heirs who were bequeathed $1 each filed their protest against admitting the will to probate. A hearing was had in the county court before a special judge. When this hearing was completed the court made findings of fact and conclusions of law and admitted the will to probate.

The contestants took an appeal to the district court, where the case was tried de novo. At the close of the trial the district court made the following findings of fact and conclusions of law:

"The first question to settle in this case is whether or not Katsey McCarty was mentally competent under the federal statute to make a will.

"I find she was competent.

"And the next question is whether or not the will was properly executed and published. In the question about the execution of it, there is a question about the execution of it. Seems the statute required that she declare in the presence of witnesses that this was her last will and testament, and second, she requests them to sign it as subscribing witnesses.

"I think the great weight of the evidence is that she had the power of communicating what she meant to the subscribing witnesses. She lived for years and years with her daughter and niece, and Alba James talked English very fluently for an Indian, and under the circumstances the county judge and Indian agent talked with her in English at the time the will was presented was a circumstance that indicates to me she knew what she was doing.

"I don't like the manner in which this will was executed; I think if you look behind the curtain you will see some land in it for someone else besides the dead woman, but the evidence does not indicate that. The lawsuit between Indians in reality is between someone else and is very disagreeable to decide. I don't understand why they took so much interest in this Indian woman after she was about ready to die, and the evidence does not disclose any undue influence, and bound to decide the case by the evidence and not by inference, and so judgment of the county court is affirmed."

From this judgment Somie McCarty, Mary Cravatt, and Alba James perfected this appeal and appear here as plaintiffs in error. Tom McCarty, as beneficiary under the will, and J. H. Weatherly, as executor, appear as defendants in error.

The plaintiffs in error have set out nine specific assignments of error. In their brief they are discussed under three heads, as follows:

"I. The court erred in his 'Findings of Fact and Conclusions of Law,' that the purported will was published and attested as required by law.

"II. The trial court erred in finding, as a matter of fact and conclusion of law, that the will was not obtained by duress, coercion, undue influence or fraud.

"III. The court erred in findings of fact and conclusions of law that deceased was competent to make a will."

We will consider these in the order named. The following sections of the Revised Laws of Oklahoma, 1910, define the rules and requirements for the making of this will:

"Section 8338. Every person over the age of eighteen years of sound mind, may by last will, dispose of all his estate real and personal, and such estate not disposed of by will is succeeded to as provided in this chapter, being chargeable in both cases with the payment of all the decedent's debts, as provided in Civil Procedure."

"Section 8348. Every will, other than a nuncupative will, must be in writing; and every will, other than a holographic will and a nuncupative will, must be executed and attested as follows:

"First. It must be subscribed at the end thereof by the testator himself, or some person, in his presence and by his direction, must subscribe his name thereto.

"Second. The subscription must be made in the presence of the attesting witnesses, or be acknowledged by the testator to them, to have been made by him or by his authority.

"Third. The testator must, at the time of subscribing or acknowledging the same, declare to the attesting witnesses that the instrument is his will; and,

"Fourth. There must be two attesting witnesses, each of whom must sign his name as a witness at the end of the will at the testator's request and in his presence."

It is undisputed that this is a nonholographic will. It was prepared in Judge Barton's office; dictated by Judge Barton to his stenographer and reduced to typewriting. We have made a very careful examination of the record, and we are unable to find any evidence that supports the third requirement of section 8348, supra, "The testator must, at the time of subscribing or acknowledging the same, declare to the attesting witnesses that the instrument is his will." Jency Weatherly, one of the subscribing witnesses to the will, is the wife of J. H. Weatherly. R. J. Ross, Jr., another one of the subscribing witnesses to the will, is the brother of Jency Weatherly. Each one of these parties testified that he could not either talk or understand the Chickasaw Indian language. Mrs. Jency Weatherly does not say in her testimony that Katsey McCarty declared that the instrument was her will, or that the testator requested her to sign as a witness. R. J. Ross, Jr., referring to the signing of the will, testified as follows:

"Q. Who asked you to sign it, the interpreter or Judge Barton? A. Judge Barton. Q. Who asked your sister to sign it, the interpreter or Judge Barton? A. Judge Barton. Q. What part of the room was Katsey sitting in at that time? A. Well, best I recall, she was sitting kinda on the side and table kinda out in the middle of the room. Q. Now, Mr. Ross you don't know whether Katsey understood that instrument when Judge Barton read it over to her or not, do you, only by the grunt? A. Just by her actions she did. * * * Q. Now, did Henry in Indian tell her to go over there and touch the pen for Judge Barton? A. Yes, sir. Q. How old are you, Mr. Ross? A. Twenty-six years old. Q. And you had never seen Katsey McCarty to know her, had seen her but did not have no acquaintance with her? A. No, sir. Q. She did not know you, did she? A. No, sir."

Re-Direct Examination. By Mr. Barton.

"Q. To refresh your recollection I will ask you, Mr. Ross, if after I read it in English and Henry Daily read it in Chickasaw or talked to her in Chickasaw with the paper in his hand, if I did not ask her if she wanted you all to sign as witnesses; did I ask the old lady if she wanted you all to sign as witnesses? A. I believe you did."

Henry Daily acted as interpreter. It is claimed he interpreted the will to Katsey McCarty. On direct examination by Judge Barton Henry Daily testified as follows:

"Q. Did the old lady and you and the witnesses, did you and the other two witnesses—were you all together when you signed? A. Yes, sir. Q. State whether or not I asked if she wanted you all to sign as witnesses? A. Yes, sir. Q. Did she say yes or not? A. She said yes."

On cross-examination Henry Daily testified:

"Q. When you went in Judge Barton's office where Katsey was, was the other subscribing witnesses, R. J. Ross and the woman, Mrs. Weatherly, were they in there at the time you were called in? A. Yes, sir; they were in there. Q. They were in there? A. Yes. Q. Did they stay there all the time? A. Well, I could not. Q. Now, Henry, to refresh your memory I will ask you if this is not the case—you were called in there—Tom McCarty was there? A. Yes. Q. And Mr. Weatherly, her guardian—they were all there when you were called in? A. Yes."

Judge C. O. Barton took the witness stand in behalf of the proponents, who are defendants in error here, and testified as follows:

"Q. Now, this will was written in your office was it? A. It was. Q. You were present? A. Yes; dictated the will to my stenographer, who is my son. Q. Who gave you the information from which you dictated that will? Q. You mean on that day? A. Yes. A. All the information that I had was on that day that Katsey wanted to leave her property to Tom McCarty. her son. Q. And you had the will written accordingly? A. Yes, and I asked her if she wanted to do that, give everything to Tom, and she made the Indian answer 'yes,' which is a grunt. Q. Then you, after the will was written, explained it to her, read it to her? A. I did; I read it to her in English first. Q. Then what did you do? A. I told her guardian that I thought we ought to have an interpreter, and there was a good one with Judge Cowart who had been an interpreter for the Indian Department, Henry Daily, and I would go and get him. * * * By the Court: Q. Did you get an interpreter, that is the point? A. I did get an interpreter. By Mr. McKeel: Q. Go ahead. A. Brought him in and handed him the will and told him to read that to her and explain it to her, and he did so. I asked her if she wanted those . witnesses in there to sign it, and she grunted yes, and I called the names of the witnesses, who were all present, and she touched the pen and I signed her name. Q. She signed the will then in the presence of the witnesses? A. She did, touched the pen and I signed it for her. Q. And the witnesses signed the will? A. They did. Q. In her presence and in the presence of each other? A. Yes. Q. And at her request? A. They did."

Percy Barton, the son of Judge Barton, who was the stenographer that transcribed the will, on direct examination by Judge Barton, testified:

"Q. Ask you to state whether or not I, as attorney, asked the old lady if she wanted these witnesses to sign that will? A. You did. Q. Were they all present? A. Yes. Q. She present? A. Yes. Touched the pen."

Neither J. H. Weatherly nor Tom McCarty, who were present in the office at the time of the execution of the will, said a word about the testatrix either declaring the instrument to be her will or requesting anyone to sign as witnesses to the will.

Tom McCarty, the beneficiary under the will, was questioned about his mother's ability to talk the English language, and on this testified as follows:

"Q. Your mother, you say, spoke a few English words? A. Yes, sir. Q. Just a few words, wasn't it, Tom, she understood; your mother just understood a few words; say 'yes' and 'no'? A. She could talk some. Q. Mighty little? A. Talk some besides 'yes' and 'no'. Q. Say some other words besides 'yes' and 'no'? A. Yes. Q. What bread was and meat on the table? A. Yes. Q. That was about the extent of her conversation in English, wasn't it, Tom? A. Yes, sir. Q. Tom, you know if you win this case you get the whole thing except what you give to your lawyers?. A. Yes. Q. You brought your mother up here when you carried her to Judge Barton's office to make the will? A. Yes, I brought her. Q. Why didn't you let Alba come along with you that day? A. Just had a one seated buggy and wasn't enough room for all three of us."

The record does not disclose that any persons were present at the time of the execution of the will other than the ones whose testimony we have reviewed.

The trial court in its findings of fact raises the question of whether or not the will was duly executed, and then states:

"I think the great weight of the evidence is that she had power of communicating what she meant to the subscribing witnesses."

The court then concludes she knew what she was doing. It is clear the trial court did not make a finding of fact that she, in any way, complied with the third paragraph of section 8348, supra:

"The testator must, at the time of subscribing or acknowledging the same, declare to the attesting witnesses that the instrument is his will."

If the court had made such a finding, it would not have been supported by any evidence.

The evidence to support the fourth requirement of section 8348, supra, is very meager. It was elicited by Judge Barton by leading questions, and clearly indicates that he was the prime mover in the request that the subscribing witnesses sign as such. However, it is not necessary for us to pass upon the sufficiency of that evidence.

In Hill v. Davis, 64 Okla. 253, 167 Pac. 465, this court said:

"On proceedings to probate a nonholographic will, it appeared that the decedent could speak and understand only the Creek language. Two of the three witnesses who purported to attest the execution thereof could not speak and understand that language, but only the English language; one of the witnesses could speak and understand both languages. The declaration that the instrument was her will and the request that the witnesses sign their names thereto as such were made by the decedent in the Creek language, which was un-

derstood by one of the witnesses, but not by the others. The declaration and request were interpreted and repeated in English by the one witness to the other two, but the decedent could not understand the same. Held, the declaration that the instrument was her will and the request that the witnesses sign the same were made by the decedent to only one attesting witness, and probate thereof was properly denied; the statute requiring that there be two attesting witnesses to whom the declaration and request must be made."

In Dufek et al. v. Klufa, 78 Okla. 13, 188 Pac. 329, this court said:

"The evidence discloses that the will was subscribed and purported to be attested by three witnesses, to wit, Dr. H. B. McCorkel, Mrs. Anna Smith, and Lizzie Kafka (now Lizzie Morava); that Dr. McCorkel could speak and understand the English language but could not speak nor understand the Bohemian language; that Mrs. Anna Smith, who acted as interpreter, could speak and understand both languages; and that Lizzie Kafka could speak and understand the English language and could understand the Bohemian language, although she could not speak it. * * * Although Anna Smith was the only attesting witness who could both speak and understand the Bohemian language, and could also speak and understand the English language, Lizzie Kafka, one of the attesting witnesses could speak and understand the English language, and could also understand the Bohemian language, although she was unable to speak it. When Anna Smith interpreted the will, which was written in English, into the Bohemian language, she, the testator, and Lizzie Kafka all understood it; and when the testator declared the same to be his will and requested the witnesses to subscribe their names and attest it, Anna Smith and Lizzie Kafka, through their senses, understood the declaration and the request and subscribed their names pursuant thereto. They thus became qualified subscribing and attesting witnesses."

In Swift v. Wiley, 1 B. Mon. (Ky.) 114, the Kentucky Court of Appeals defined "attest" and "subscribe" as follows:

"To attest the publication of a paper as a last will, and to subscribe to that paper the names of the witnesses, are very different things, and are required for obviously distinct and different ends. Attestation is the act of the senses, subscription is the act of the hand; the one is mental, the other mechanical, and to attest a will is to know that it was published as such, and to certify the facts required to constitute an actual and legal publication; but to subscribe a paper published as a will, is only to write on the same paper the names of the witnesses, for the sole purpose of identification. There may be a perfect

attestation in fact, without subscription. But to insure identity and prevent the fraudulent substitution of any other document than that which had been published and attested, the statute providently requires the attesting witnesses to subscribe their names in the presence of the testator. * * *"

In Burke v. Nolan, 1 Dem. Sur. (N.Y.) 436, it is said:

"Hence it is necessary that the testator should in some manner communicate to the attesting witnesses, at the time of his subscription or acknowledgment, the information that the instrument which they are called upon to sign as witnesses is his will (Gilbert v. Knox, 52 N. Y. 125, 128; Lewis v. Lewis, 11 N. Y. 220, 226; Coffin v. Coffin, 23 N. Y. 1, 15; Seymour v. Van Wyck, 6 N. Y. 120)."

The record fails to disclose any evidence to support an attestation of the will. Not a word of testimony can be found in the record falling from the lips of anyone of the persons who were present at the time of the execution of the will to the effect that the testatrix made any declaration that it was her will.

The burden of proof rests upon the proponents of a will to establish by a preponderance of the evidence that the will was executed and published according to the provisions of the statutes.

"The burden is on the proponents to show, beyond a reasonable doubt, that the will was executed according to the provisions of the statute (Tarrent v. Ware, 25 N. Y. 425, 420, n.); and, upon the evidence, it cannot be said that there was a proper declaration to both witnesses that the instrument signed by the testator was his will, or that there was a sufficient request to both to sign it. It is even doubtful if there was a proper request at all to either witness to sign the will. Probate must therefore be denied." Burke v. Nolan, supra.

At the conclusion of the testimony the proponents offered in evidence the ex parte affidavits of the subscribing witnesses. The contestants objected to this evidence and the court sustained the objection. The ex parte affidavits contained this recital:

"* * * The said Katsey McCarty upon signing the same declared to us that the said instrument was her last will and testament, and requested us to sign the same as witnesses."

These affidavits were not admissible over the objections of the contestants, because the witnesses who made the affidavits were upon the witness stand and had the opportunity to testify concerning all the things of which they had knowledge that transpired at the time of the execution of the will.

On this question the same rules apply as in civil actions. In civil actions the deposition of a witness is not admissible in evidence over the objection of the opposing party where it is clearly shown that the witness is in court or could be produced in court at the trial of the case. Neither did the recital contained in the attesting clause of the will to the effect that the testatrix declared the instrument to be her will obviate the necessity of the proponents making plenary proof of the execution of the will.

The second assignment of error, as argued by plaintiffs in error in their brief, is:

"II. The trial court erred in finding, as a matter of fact and conclusion of law, that the will was not obtained by duress, coercion, undue influence or fraud."

We have made a thorough and careful examination of the record in this case, and are forced to the conclusion that the evidence does show fraud and undue influence on the part of defendants in error in procuring the will to be made by the testatrix. The evidence shows this state of facts: Katsey McCarty had been blind from ten to 14 years. During practically all of this time she had lived with her daughter, Mary Cravatt. Alba James, the granddaughter of Katsey McCarty and the niece of Mary Cravatt, had made her home with Mary since the death of Alba's mother, which occurred when Alba was about nine years old, and Alba was about 25 years old at the time of the death of her grandmother, Katsey McCarty. During all the time that Katsey McCarty had been blind Alba had been her companion; lead her around; went with her to places where she desired to go; acted as her interpreter; wrote letters for her and rendered her invaluable services as a companion. Mary Cravatt had provided her with a home, and during the last four or five years while Weatherly was the guardian of Katsey McCarty he had paid either to Katsey or Mary the sum of $7.50 per month out of the funds belonging to Katsey for her support. Tom McCarty had for several years been making his home part of the time with J. H. Weatherly and part of the time with Mary Cravatt. He admitted that he would frequently stay at Mary's two or three weeks at a time. He did not pay any board or furnish any of the things to eat. He testified that Alba was not good to his mother. On being asked what Alba ever did that was bad, he admitted she did not do anything bad, but sometimes when his mother asked Alba to do something she would not pay any attention to her. At the time of Katsey's death she was approximately 70 years old. It cannot be presumed that any person would be able to meet all of the childish whims of a woman of this age and who was totally blind. Weatherly's custom had been to buy the clothing needed by Katsey at a store in Stonewall. He lived a few miles in the country from this place. On this occasion Weatherly arranged at Stonewall for Tom McCarty to get a team and buggy at the livery barn, go and get his mother, and take her to Ada ostensibly to purchase clothing for her at Ada. He also furnished Tom McCarty money for the trip. Tom McCarty drove to Mary Cravatt's to get his mother. She wanted Alba James to go along, but Tom McCarty refused to let her go, saying there was not room enough in the buggy. They drove to Stonewall in the buggy, which was only a few miles distant from Mary Cravatt's home. From there they went on the train to Ada. Weatherly, his wife, and his wife's brother, R. J. Ross, Jr., joined Tom and Katsey at Ada. There is some conflict in the testimony and difference of opinion as to what ones were together when they went to Judge Barton's office to have the will drawn; but these five eventually met in Judge Barton's office, where the will was prepared and executed as hereinbefore set forth. Weatherly gave Katsey McCarty some money immediately after the will was executed. However, it is not shown for what purpose this money was given to Katsey. They did not purchase goods for Katsey at Ada, but she was taken back to Stonewall, where she purchased approximately $25 worth of clothing and dry goods at the store where her goods were usually purchased under arrangements made by Weatherly, her guardian. It was claimed that Mrs. Weatherly went to Ada for the purpose of helping Katsey select the goods she was to purchase, but it does not appear that Mrs. Weatherly went to Stonewall and assisted Katsey in selecting the goods she did actually purchase. Tom McCarty denies that he said anything to his mother about the will on his way from only taking her to Ada to purchase goods, yet according to his testimony he did not go with them to Judge Barton's office, but later joined them there. He must have had some previous understanding or knowledge they would be there. We find Katsey McCarty, an Indian, approximately 70 years old, able to speak only a few words of English, totally blind, in the town of Ada with J. H. Weatherly, her guardian, and

Tom McCarty, her son, and while under their influence and direction she makes a will disinheriting her daughter and grand-daughter who have been her main stay and companions during ten or twelve years of her affliction and giving all of her prop-erty to Tom McCarty, the boon companion of Weatherly, her guardian. Weatherly is made the executor of the will without bond. During all of the time Katsey was afflicted with total blindness she was be-ing administered to and cared for by Mary Cravatt and Alba James. It is not shown that Tom McCarty ever did one thing for her in a material way. These circum-stances speak louder than words of undue influence. The record conclusively shows this will was prepared at the instance and direction of Weatherly and Tom McCarty and while she was under their influence. In her enfeebled and dependent condition she might be easily influenced. To estab-lish undue influence it is not necessary that there be direct testimony that threats were made or even persistent entreaty or per-suasion was brought to bear upon the mind of the testatrix. It is sufficient that if from all the surrounding circumstances connected with the making of the will it appears that any undue influence has been exercised, the court should not ad-mit the will to probate. In determining the question of undue influence, the court should take into consideration the associa-tion of the parties; the opportunity for undue influence afforded the person who is especially favored by the terms of the will and the effect of the will upon those persons whom we would naturally expect to be the recipients of her bounty. But op-portunity for undue influence, standing alone, is not sufficient to establish undue influence.

From this record it clearly appears to us that J. H. Weatherly and Tom McCarty deliberately planned to get Katsey McCar-ty away from her home and those on whom she had depended, under the pre-tense of taking her to Ada to purchase clothing for her, and while she was under their influence and control procured her to execute the will.

We do not believe this instrument is the will of Katsey McCarty. The free agency of the testatrix was destroyed at the time she executed the instrument, and the will of J. H. Weatherly and Tom McCarty was substituted for hers.

The rule announced in Squires v. Cook, 177 Iowa, 586, 157 N. W. 253, is applicable here, wherein the court said:

"But under the circumstances of this case, where the deceased was old and feeble and a confidential relation existed, we think the rule announced in Ross v. Ross, 140 Iowa, 51, 61, 117 N. W. 1105 to the effect, briefly stated, that if a person who was aged and of impaired mind and memory, though he may not have been legally incompetent to make a will, yet the will of such a person ought not to be sustained unless such dis-position of his property appears to have been fairly made, and to have emanated from a free will, without the interposition of others, and that if the jury should find under all the circumstances that the dispo-sition of the property did not emanate from a free will and was not in accord with tes-tator's previous intentions, etc., the jury would be justified in finding that the will was not the voluntary act of the testator, but that it was obtained by undue influence. We have not attempted to give the exact language, but the substance only."

See Jackson v. Jackson, 38 N. Y. 153; Esterbrook v. Gardner, 2 Demarest (N. Y.) 543; Estate of Snowball, 157 Cal. 301, 107 Pac. 598.

The burden of proof rested on the pro-ponents of the will to prove not only the due execution of the will, but that the instru-ment was the free and voluntary act and will of the testatrix.

In Snodgrass v. Smith, 42 Colo. 60, 94 Pac. 312, 15 Ann. Cas. 548, the Supreme Court of Colorado in the third paragraph of the syllabus said:

"The proponent of a will has the burden of proving the execution, in accordance with the requirements of the law, and that the instrument is the free and voluntary act of testator."

In this case the proponents failed to prove that the instrument was in fact executed, as the free and voluntary act and the will of the testatrix. Having failed to establish this fact, the court should have denied the probate of the will.

Having reached these conclusions, that the case should be reversed on each of the as-signments of error discussed in this opin-ion, it is unnecessary to consider the other ground of error.

The judgment of the trial court is re-versed, and the cause remanded, with in-structions to render judgment denying the probate of the will.

PITCHFORD, V. C. J., and KANE, JOHN-SON, and KENNAMER, JJ., concur.