## W. H. CASH and HELEN T. CASH, Appellants, v. MAUD F. DENNIS, Appellee.

**Wills:** CONTEST: EVIDENCE. In the contest of a will a witness who was not called as an expert on the question of the testator's mental capacity, nor examined in chief on that subject, was not shown to be competent to testify on cross-examination and give his opinion of the intelligence and capability of the testator to transact ordinary business; and rejection of the evidence was especially proper, where the witness had already testified on the subject.

**Same:** Conversations with one of two joint beneficiaries under a will, as to the reason why testator left the home of a relative and came to live with them, and which were made in the presence of testator, were admissible to show the relations of the parties and the influence acquired over the testator.

**Same:** IMPEACHMENT OF WITNESS: IMMATERIAL MATTERS. The answers of a witness on cross-examination touching collateral and irrelevant matters are binding on the party eliciting the same, and he cannot contradict or impeach the witness in that regard.

**Same:** PRIVILEGED COMMUNICATIONS. The proponent and beneficiary under a will is not competent to testify to personal transactions with the testator.

**Instructions:** REQUESTS. It is the general rule that courts decline to give requested instructions in the language in which they are asked, even though they embody correct legal principles.

**Same:** UNDUE INFLUENCE: BURDEN OF PROOF: APPLICATION OF RULE. Where the relationship of patient and physician is shown to have existed, at and prior to the making of a will by the latter in favor of the former, the burden is on the latter as proponent of the will to show that the instrument was executed without any undue or wrongful influence on his part; and this rule applies with equal force where the questions arise in a law action as where they are involved in equitable actions.

**Same:** UNDUE INFLUENCE: EVIDENCE: INSTRUCTION. The fact that a will is unjust to those dependent upon testator's bounty, or that it is not in accord with his prior declarations of intent, or that

the testator was mentally weak, when standing alone, are not sufficient to establish undue influence; but they are all proper matters to be considered on that issue. The instruction in this case dealing with these facts is held to correctly state the law.

Same: INTRUCTIONS. A party asking instructions upon an issue cannot complain that the court submitted the issue, though not in the exact language of the request.

Same: TESTAMENTARY CAPACITY: EVIDENCE. The fact that an aged testator transacted his own business and seemed to those coming in contact with him in a business and social way to be of sound mind, while competent on the question of testamentary capacity was not conclusive; and under the evidence in this action the question was properly submitted to the jury.

*Appeal from Taylor District Court.*—HON. THOMAS L. MAXWELL, Judge.

FRIDAY, FEBRUARY 14, 1913.

ACTION to probate a will objected to on the ground of want of testamentary capacity and undue influence. Verdict and judgment for contestant, and proponents appeal. —*Affirmed.*

*McCoun & Burrell* and *Sullivan & Sullivan,* for appellants.

*G. B. Haddock* and *Frank Wisdom,* for appellee.

GAYNOR, J.—On the 10th day of April, 1911, the will in controversy in this suit was filed with the clerk of the court of Taylor county for probate, and on the 1st day of May, 1911, Maud F. Dennis, contestant herein, filed objections to the probate of the will on two grounds: (1) That the execution of the will was procured by undue influence. (2) That the testator was, at the time of the making of the will in controversy, of unsound mind.

On the issues thus tendered, the cause was tried to a jury, and a verdict rendered for contestant, finding that the will was not the last will of said George W. Tanner, and judgment was entered accordingly. From the judgment thus entered, the proponents, W. H. and Helen T. Cash, appeal.

It appears from the provisions of the will in controversy that the testator, George W. Tanner, after making provision for the payment of his just debts and funeral expenses, bequeathed all his property to proponents. It appears that one of the proponents, W. H. Cash, was a physician; that he had been the family physician of the testator; that he attended upon testator's wife during her last sickness; that she died September, 1909; that on or about August, 1910, he went to reside with proponents, and continued to reside with them up to the time of his death that while so residing with them the will in question executed that after the death of Mrs. Tanner proponent W. H. Cash continued to wait upon and attend testator as a physician; that the testator was in feeble health; that prior to his taking up his home with the proponents he had visited them frequently; that the relationship of physician and patient existed between the testator and proponent, W. H. Cash, during all the time subsequent to the death of Mrs. Tanner.

It appears, further, that the contestant, Maud F. Dennis, was a niece of testator, George W. Tanner, and that prior to the execution of the will in controversy, and on the 16th day of September, 1909, George W. Tanner devised all his property to the contestant, Maud F. Dennis. Will so executed was witnessed by proponent W. H. Cash; that at the time of the execution of the will Tanner also made a lease of his real estate to the husband of Mrs. Dennis, and that thereafter Mrs. Dennis and her husband took possession of the real estate under the lease; that at the time of the execution of the will devising the property to Mrs. Dennis, and the execution of the lease from Tanner to her husband, a contract was entered into between Mrs. Dennis and testator, by which it agreed

that in consideration of $500 she would provide him a home, board, care, etc., for one year, and it appears from said agreement that it might be terminated by either party before the expiration of the year, when either became dissatisfied, and in that event the testator should pay Mrs. Dennis $10 a week up to the time of the termination of the contract; that the testator continued to live with Mrs. Dennis, under said agreement or contract, from some time in November, 1909, until about August, 1910, when he left and took up his home with proponent; that while residing with Mrs. Dennis he frequently visited with the Cashs and it is claimed by the Cashs; that he went to live with them under an agreement that if they kept him the balance of his days, treated him kindly, and cared for his wants he would leave them all his property.

It appears, further, that the testator, at the time of the transactions hereinbefore set out, had no children living; that there was one child born to him, but she was, at the time, of these transactions, dead and that this daughter, of whom testator was very fond, bore a resemblance to Mrs. Dennis.

It appears, further, that the only relatives of the said George W. Tanner that were positively known to be living at the time of his death were the contestant, Mrs. Dennis, and two of her brothers, being children of testator's deceased brother.

It appears that at the time of Mrs. Tanner's death the contestant and her husband were living in Colorado, and that they returned to Iowa at the request of testator; and, in consideration of their returning and taking up their home with him, the will, lease, and contract, hereinbefore referred to, were made.

It also appears that prior to the execution of this will in favor of Mrs. Dennis and the execution of the lease and contract, hereinbefore referred to, the testator, George W. Tanner, had executed a will in favor of contestant's little son, then about eleven years of age, which will was destroyed at the time of the making of the will in favor of Mrs. Dennis.

There was considerable testimony offered for and against contestant's claims that the will was obtained by undue influence, and that the testator was wanting in testamentary capacity and this evidence, in many respects, is conflicting. The relationship between contestant, her family, and the testator was fully shown by the evidence. His mental attitude toward her and her family, prior to the execution of this will and prior to his going to live with proponents, was also shown. His relationship to the proponents, their conduct towards him, and his mental attitude towards them was also shown. His physical condition during this time and his need of medical advice and treatment was also shown; and that the proponent W. H. Cash waited upon him and attended him as his physician is not disputed.

We have read the whole record with care, and find that the verdict of the jury has support in the evidence, and ought to stand, unless some error in the submission of the case to the jury, of which complaint is made, prejudicial to the interests of proponent, appears.

The grounds upon which plaintiff seeks reversal may be grouped into four: (1) That the court erred in the admission and rejection of testimony offered. (2) That the court erred in submitting to the jury the question of want of testamentary capacity on the part of George W. Tanner at the time of the making of the will. (3) That the court erred in not giving the instructions asked by the proponents. (4) That the court erred in giving instructions four and ten on its own motion.

I. The first error complained of in the introduction of evidence is that the court sustained objection to a question asked by proponents of a witness, Elmer Brown, as follows:

1. WILLS: contest: evidence. "You considered him (meaning Tanner), at the time, of ordinary intelligence and capable of transacting ordinary business?" This question was objected to, and objection sustained, and in this we feel that

the court was right, for the reason that the same question had already been asked and answered by the witness, and for the further reason that it was not cross-examination of the wit-ness as to any matter drawn out upon the direct examination. Nor was the foundation laid for this testimony, even if it had not been asked and answered before that. Witness, on direct examination, was not asked anything touching the mental capacity of the testator nor was he called as an expert on that point.

The second error complained of is based on the action of the court in refusing to strike out certain evidence given by the witness John Gordon.  It appears that some time sub-

2.  SAME.

sequent to the making of the will the witness Gordon, on the invitation of Dr. Cash, visited the Cash home; that while there he had a conversation with Mrs. Cash, one of the proponents, in which he claimed that she said to him, in the presence of testator, that at the time testator resided with Mrs. Dennis that his health was poor; that they treated him awful mean, and made him sleep up-stairs, where it was cold, in a room without a fire, and that he could not eat the food they provided for him; and that if he stayed there he would die.  The witness having detailed this conversation had with Mrs. Cash, the proponents moved to strike it out, on the ground that it was not made in the presence of both the proponents, and that it could not be used as evidence against the other, and that it was made after the execution of the will.  This motion was overruled, and com-plaint is made of this ruling.

It appears from all the evidence that the proponents are husband and wife, and that the bequest was a joint bequest; that whatever improper influences were exercised on the tes-tator to procure the will were for their joint benefit; and it further appears, with a reasonable degree of certainty, that the other devisee was present at the time.  This conversation, however, had with Mrs. Cash, after the execution of the will,

was competent for the purpose of showing the relationships that had been established between the testator and proponents, and the influence that they had acquired over him, she, at the time of the conversation, sitting by testator and stroking his head, and for the further reason that it appears that these facts detailed by her were not true, and testator failed to enter any denial thereof. At least, it was a fact to be considered by the jury, with the other testimony, in reaching their final conclusion upon the issues tendered.

The third objection urged to the testimony, relates to the action of the court in sustaining an objection to a question asked the witness Gordon, on cross-examination, as follows:

3. SAME: impeachment of witness: immaterial matters.

"Did you tell them you expected a big fight, but if they are going to claim the old man's mind was not right I will go down there and fight the thing, if I have to spend my own money to go?" This witness sustained no relationship to the parties, nor to the matter in controversy. This question did not relate to any matter concerning which he was examined in chief. He answered the question: "No, sir I never said any such thing." Thereafter, on further cross-examination, the question was asked again, apparently for the purpose of laying the foundation for impeachment. It is well settled in this state that, as to collateral matters called for on cross-examination, the party asking the question is bound by the answer which he receives, and is not permitted to contradict or impeach the witness on his answers on these collateral matters so injected in the record. The rule is that when a question is put to a witness, on cross-examination, which is collateral and irrelevant to the issue, his answer cannot be contradicted by the party who asked the question; but it is conclusive against him. No authorities need be cited in support of this proposition.

The fourth error assigned relates to the action of the court in not permitting Dr. Cash to testify as to whether or

not he had ever given the deceased intoxicating liquors. This was calling for personal transactions between the deceased and proponent; and therefore proponent was not competent to testify, and there was nothing in the evidence offered on the part of contestant that removed the bar against such evidence. The evidence as to the use of intoxicating liquors by Tanner related purely to his habits and conduct, and no attempt was made or offered to show that any liquor was ever offered by Dr. Cash to the testator.

4. SAME: privileged communications.

The next error assigned relates to the refusal of the court to give certain instructions asked by proponent. It is the general rule, and a safe one, that the courts decline to give instructions in the language in which they are asked, even though they embody correct legal principles. This is a general rule, well recognized in this state. On comparing the instructions given with those asked, we are satisfied that the instructions given covered, and included, every material point involved in the transaction asked, so far as they were material to this controversy, and had support in the evidence.

5. INSTRUCTIONS: requests.

We come now to the real ground of complaint in this case as we understand the record, and that relates to the giving of instructions four and ten by the court on its own motion. Instruction four, in substance, tells the jury that if they find that the testator was an old man, feeble in body and mind at the time of the execution of the will, and further find that W. H. Cash was the family physician of said testator before the death of his wife, and continued to be his personal physician up to and including the time of the execution of the will, and further find that proponent W. H. Cash was not related to testator otherwise than as his physician, and they further find that testator disposed of all his property to said physician and his wife, and that he did this contrary to his oft-expressed intent to dispose of it otherwise,

6. SAME: undue influence: burden of proof: application of rule.

and further find that W. H. Cash was instrumental in procuring the making of said will and determining its provisions, then the burden of proof would shift upon the said proponent to show good faith on his part, and that the will in his favor was executed without any undue influence exercised by him, and that it was not procured by any wrongful influence on his part.

It is conceded that this is the general rule, but it is claimed that it is erroneous as applied to the facts in this case; and it is argued that this rule is only applicable, and is only recognized and enforced, in courts of equity. The rule, as generally stated, is "that where the relation of guardian and ward, attorney and client, physician and patient, or priest and parishioner, and any like relationship, exists or is shown, and a deed or will is made in favor of such guardian, attorney, physician, or priest, when drawn into controversy, the burden is on the devisee or donee to show want of undue influence." Especially is this rule recognized and enforced where the person sustaining such relationship is shown to have been instrumental in procuring the making of the instrument and in determining its provisions, and we see no reason why this rule should not be applied with equal force where the same question is involved in a law action as in an equity case. The probative force of the circumstances are the same and the same presumption arises in such cases, not because the court can see there was fraud or undue influence, but because there may have been fraud; and it lies within the power of the other to negative the fact and relieve the transaction of any suspicion of taint, and the burden necessarily shifts to him, upon the showing of these facts, to relieve the transaction of the suggestion of undue influence in the making of the instrument in his favor under such circumstances. In support of this, see Story on Equity (11th Ed.) page 314; Pomeroy's Equity, section 963; Kerr on Fraud and Mistake, sections 150-152, 183; *Reeves v. Howard*, 118 Iowa, 121;

*Sullivan v. Kenney,* 148 Iowa, 361. We find no error in this instruction.

We now come to the consideration of instruction ten, given by the court to the jury, of which complaint is made. This instruction, when paraphrased, tells the jury simply that if the testator is aged, has an impaired mind and memory, that he made a disposition of his property which was not fair, that the disposition made did not emanate from a free will, without the interposition of others, and did not accord with intentions previously expressed, or implied from family relationships, the will ought not to be sustained, and that the jury would be justified in finding from these facts, nothing else appearing, that it was not the voluntary act and free will of the testator, even though he may have been capable and competent to make a will. The instruction as given was taken verbatim from the case arising out of the probate of the will of Mary Ames, reported in 51 Iowa, 596. This particular instruction apears on page 604 of the opinion and was there approved.

7. SAME: undue influence: evidence: instruction.

It is true that in the case of *Webber v. Sullivan,* 58 Iowa, 260, this same instruction was condemned. No reference, however, was made to the *Ames* case. It is apparent to us from the reasons given for the condemnation of this instruction in the *Webber* case, that the real import of the instruction was not grasped by the writer of that opinion; for therein he says that the legal thought expressed is "that if the will is unfair to the legal representatives the jury would be justified in finding it was obtained by undue influence," ignoring that part of the instruction in which the jury are told "that, in order to find the will invalid; they must not only find that it was unfair to the legal representatives, but that it did not emanate from the free will of the testator, without the interposition of others, and was contrary to his previously expressed intentions."

It is true that no one of the elements or facts stated in this instruction, in itself, is sufficient to show undue influence or want of testamentary capacity. The fact that the will is unjust to those who are dependent upon his bounty, in itself, is not sufficient. Prior declarations of an intent, contrary to the subsequent disposition of the property, are not in themselves sufficient; but such facts are competent evidence, as bearing upon the mental capacity of the testator and the existence of undue influence, though not in themselves sufficient to establish it. *Muir v. Miller,* 72 Iowa, 585; *Parsons v. Parsons,* 66 Iowa, 754; *In re Hollingsworth,* 58 Iowa, 526; *Bates v. Bates,* 27 Iowa, 110; *Johnson v. Johnson,* 134 Iowa, 33.

Mental weakness, in itself, is not sufficient to invalidate a will, but it is a circumstance of importance in determining the effect of influence or other circumstances upon the mind of the testator, and, when connected with other circumstances of an impeaching character, has great weight; and where the provisions of the will are unusual, or extraordinary, the fact of mental weakness is to be considered. Especially is this true if the relationship of the parties is such as reasonably to warrant the presumption of undue influence. *Stephenson v. Stephenson,* 62 Iowa, 163.

The instruction under consideration was given in the case of *Ross v. Ross,* reported in 140 Iowa, 51, and there set out in full, and, though not directly approved, it was impliedly so, at least not condemned; but in that case contestants appealed, and under no circumstances could it be prejudicial to them. But, however, it was said in the *Ross* case, touching this instruction, that it had support and was sustained by the *Ames* case.

In support of the conclusion hereinbefore reached, and as bearing upon the criticism of this instruction made in the *Webber* case, we cite *Mileham v. Montagne,* found in 148 Iowa, 476; and the law seems to be well settled that the jury, in determining the ultimate question submitted in a case like

this, have the right to consider any evidence showing that the will was just or unjust, reasonable or unreasonable, natural or unnatural, the natural objects of testator's bounty, the financial condition of the different members of his family at the time of the execution of the will, the extent of the estate of the testator, and apparent inequality or inequity in the provisions of the will. Although no one of these matters standing alone, would justify the jury in finding want of mental capacity in the testator, or the existence of undue influence, yet they are proper to be considered by the jury. We find no reversible error in the giving of this instruction, and yet, at the same time, we do not approve of the wording of the instruction, and suggest that the law can be more clearly stated in some other form than that in which it is expressed in this instruction.

It is next urged that the court erred in submitting to the jury the question of want of testamentary capacity, appellant claiming that there was not sufficient evidence to justify the submission of this question to the jury; but it appears that the defendant made no motion to withdraw the consideration of this question from the jury, made no request that it be withdrawn, but rather gave the court to understand that appellant wished it submitted to the jury, for appellant submitted to the court and asked the court to give instructions upon this question, and asked that they be submitted to the jury; and the instructions given by the court are substantially the same as those asked by appellant. It is well settled that appellant cannot complain now of the action of the court in doing what appellant then asked the court to do. Where a party asks instructions upon an issue, and the court gives the instructions, though not in the exact words asked, yet in substance, the party cannot complain of the action of the court in so doing.

Moreover, we are constrained to believe, from the examination of the record, that the issue was properly submitted

8. SAME: instructions.

to the jury. The fact that the testator transacted his own business, and to all outward appearances seemed to be of sane and sound mind to those with whom he came in contact in a business or social way, while competent to be considered on the question of sanity, does not, of itself, conclusively establish sanity. Mental unsoundness may exist in such a person, which would render him incompetent to make a will, notwithstanding his apparent sanity to those with whom he comes in contact, and who are not experts on the subject of sanity.

9. SAME: testamentary capacity: evidence.

The questions which relate to the discovery and proof of sanity are, perhaps, the most difficult of any with which courts and juries are compelled to deal. Mental disease, in itself, is so various in character, so vague sometimes in its manifestations, and so deceptive, especially in its early stages, and its causes are so subtle and so difficult to trace, that the most experienced experts are sometimes obliged to confess that, however careful and thorough their investigations, they still prove unsatisfactory, leaving the mind, not only in a condition of painful uncertainty upon the principal question whether mental disease actually exists, but failing utterly in many cases to trace it to any sufficient cause. This fact is well known, not only to alienists, but to laymen as well. For support, see cases cited in *Milekam v. Montagne, supra;* also *Bonnot v. Newman,* 109 Iowa, 580; *Barron v. Collenbaugh,* 114 Iowa, 71; *Smith v. Sioux City R. R. Co.,* 38 Iowa, 173; *Campbell v. Ormsby,* 65 Iowa, 518; *Light v. C., M. & St. P. Ry. Co.,* 93 Iowa, 83. See, also, in support of some of the questions herein determined, *People v. Garbutt,* 17 Mich. 16 (97 Am. Dec. 162).

We find no reversible error in the record and the cause is *Affirmed.*