IN RE WILL OF BERNARD SHIELDS.

No. 39529.

MARCH 12, 1929.

REHEARING DENIED JUNE 24, 1929.

*Bert B. Welty* and *Welty, Soper & Welty,* for appellants.

*Addison & Smedal,* for appellees.

STEVENS, J.—I.  Bernard Shields, testator, died in March, 1929, a day or two after the execution of the will in controversy. He was a bachelor, 84 years of age, and, for a few years immediately preceding his death, resided at Peoria,  Illinois.  On March 10, 1926, he left Peoria, and came to Story County, where he had formerly resided, going to the home of Fred Kutter, near Colo.  While there, he became seriously ill, and, on the morning of the 20th, signed and executed the will in controversy.  Immediately thereafter, he was taken to a hospital in Marshalltown, where he died, as already stated, a day or two later.  He left surviving him a brother, James Shields, who resided in Illinois, and several nephews and nieces.  At one time, the testator and a brother, Tom, who predeceased him, lived together, and "bached" in Story County.  Tom gave him 80 acres of land.  He also gave to the children of James Shields in trust $8,000, the income therefrom to be paid to their mother.

The grounds upon which the admission of the will to probate is being contested are undue influence and mental incompetency.  The court withdrew the issue of undue influence, and refused to submit it to the jury.  This ruling presents the first question for our consideration.

The sole beneficiary named in the will is John Hindert, a nephew.  The evidence shows that the testator, about 1920, went to Illinois to reside, and lived for nearly two years in the home of James Shields.  In March, 1923, he went to the home of John Hindert, where he resided until he returned to Story County, in

March, 1926, preceding his decease. The trip to Iowa was made by the testator alone, and the purpose of his visit seems to have been to look after some business relative to the sale of the 80-acre tract given him by his brother Tom. When his final illness had progressed to such a point that it was doubtful whether he could recover, he requested that his nephew John Hindert be summoned. A message was sent at once, and he came immediately. The will was executed after his arrival at the Kutter home. Hindert was present in the room when the scrivener who prepared the instrument came, but left before the will was signed and executed. The scrivener, a notary, was called at the request of the testator. The physician, who called him, suggested Charles Yeager as a proper person to prepare the instrument, and he was immediately summoned. The record does not disclose whether there was any conversation between Hindert and the testator in the morning concerning the execution of a will.

On July 6, 1925, Mae L. Hindert, the wife of John, wrote a letter to the testator, who was in Iowa, suggesting that he fix up his affairs, and get some paper on record ''for us, so that neither you nor I will have to worry about it when you come back? I think that would be the best way to do, and then we would both know where we would be at. All of the relatives are telling us that you don't intend to do any more for us than the rest of them, and it makes it bad all around. If you would just take care of that and put something on record that we could rely upon you know we would all be better satisfied. Jack and I have both received our discharge in bankruptcy and there is nobody who would have any claim whatever on anything that would be given to us now.''

On July 15th of the same year, the testator executed a will, devising all of his property to John and Mrs. Hindert. This will was later destroyed. On August 27, 1924, the testator entered into a contract in writing with Fred Kutter, agreeing to sell and convey the 80-acre tract to him. On the day preceding the execution of the first will, the testator also executed a deed conveying the 80 acres to John Hindert, but reserving the life use thereof, and providing therein that the conveyance was subject to the terms and conditions of the contract between himself and Fred Kutter.

It is contended in argument that the foregoing deed was

never delivered. Hindert, however, testified that he had it in his possession for two weeks, and that he gave it to the testator when he returned to Story County, to have the same placed of record. Except the foregoing incidents, there is nothing shown in the evidence upon which to base the contestants' claim that the will was executed as the result of undue influence practiced upon the testator by Hindert or others in his behalf. The evidence shows that the testator resided for about three years at the home of the devisee; that he was cared for by him and his wife; and that nothing was paid them for the services rendered. The most that can be claimed for the testimony of contestants on this branch of the case is that there is sufficient evidence to raise a mere suspicion as to the good faith of Hindert.

The letter written by Mrs. Hindert and referred to indicates that it was her desire that the beneficiary of her kindness do something that would protect her in the event of his death. There is no urging in the letter, and the request that something be done was respectful, and without any apparent desire or purpose to overpersuade the testator to do that which she may have believed an act of justice, if not of gratitude. There is no evidence that the instrument was not executed as the free and voluntary act of the testator. This issue was properly withdrawn from the jury. *Henderson v. Jackson,* 138 Iowa 326; *Perkins v. Perkins,* 116 Iowa 253; *In re Estate of Cooper,* 200 Iowa 1180; *Monahan v. Roderick,* 183 Iowa 1; *Cash v. Dennis,* 159 Iowa 18.

II. It is also contended by appellants that the verdict of the jury is not supported by the evidence. We gather from the record that the testator was eccentric, and extremely uncouth and untidy in his appearance and habits. Considerable medical testimony was introduced, to show that he was suffering from a complication of diseases, such as hardening of the arteries, senile dementia, Bright's disease, and other serious ailments. On the other hand, the record contains much evidence tending to show that he was alert, and that he at all times comprehended and understood his business, and was enabled to transact the same up to the time of his death. He sold the farm to Kutter at a good price, and there is no suggestion that he did not then fully comprehend and understand the nature of the transaction. It is true that he became forgetful, and, according to the testimony of several wit-

nesses for appellants, displayed distinct evidence of mental unsoundness. The physicians who attended him in his last illness were of the opinion that he was incompetent to transact business, or to know and comprehend the extent and nature of his property or the names of his relatives or of those having claims upon his bounty. It is shown that, at the time of the execution of the will, he immediately recognized the scrivener, called him by name, and told him that he desired his will written. In response to a question as to what disposition he desired to make of his property, he replied, "I want to give it all to Jack Hindert."

The testimony shows that the testator resided in the home of James Shields for nearly two years; that he was a great burden and care to Mrs. Shields; and that he never paid anything for his care and the services rendered. This was, apparently, an act of great injustice, as the family was very poor. It appears, however, that James Shields was a professional gambler, and that he died in 1927, while an inmate of the county home. It does not appear whether the testator knew of the bounty conferred upon the children of James Shields by his brother Tom or not. It is probable that he did. The testator's farm was sold by him to Kutter for $12,000, and this represented the only assets of his estate. The jury might well have found from the evidence that the testator was mentally incompetent to execute a will; but it was in sharp conflict, and the question was clearly for the jury.

III. The remaining complaints of appellants relate to the court's instructions. The court placed the burden of proving testamentary incapacity upon the contestants. This, it is contended, was error. Appellant concedes the general rule that every person is, in the first instance, presumed to be sane, but contends that the evidence in this case is conclusive that the testator was so far advanced in senile dementia that the presumption of sanity was overcome, and that the burden of proving testamentary capacity at the time the instrument was executed passed to the proponents. There had been no prior adjudication of insanity, and the evidence does not clearly, nor without substantial dispute, show that the testator was so far affected by a progressive mental disease as to be permanently of unsound mind and wholly incapable of transacting ordinary business. The only issue submitted to the jury was that of the testamentary capacity

of the testator. The evidence in favor of the contestants did tend to show that the testator was possessed of a progressive mental disease, and that he was of unsound mind; but, on the other hand, the evidence, mostly of lay witnesses who knew the testator, tended strongly to prove the contrary. The evidence did not, we think, bring the case within the rule for which appellants contend: that is, that insanity, once established, will be presumed to continue until the contrary is shown. *In re Will of Knox,* 123 Iowa 24; *Wendt v. Foss,* 161 Iowa 122; *Kirsher v. Kirsher,* 120 Iowa 337; *Speer v. Speer,* 146 Iowa 6; *Perkins v. Perkins,* supra; *Bever v. Spangler,* 93 Iowa 576; *Glass v. Glass,* 127 Iowa 646. We think the issue was fairly submitted to the jury. No instruction was requested on this issue.

IV. Instruction 3 is complained of, but this instruction merely informed the jury that it appeared in the evidence without dispute that the purported will was signed and witnessed in the manner and form required by law. This instruction was neither too narrow nor could it conceivably have misled the jury.

V. The court in Instruction 4 defined what is meant by a sound mind, and told the jury that no mere weakness of mental powers or impairment of the mental faculties is sufficient to in-validate a will if the testator knew and comprehended the natural objects of his bounty, the nature and extent of his property, and the disposition he desired to make thereof. This instruction, while somewhat brief, is in harmony with the general rule in this state. *Meeker v. Meeker,* 74 Iowa 352; *Cash v. Dennis,* 159 Iowa 18; *Speer v. Speer,* supra.

VI. Instruction 5 more fully explained to the jury the numerous matters to be taken into consideration in determining the question of testamentary capacity, such as the terms of the will, whether reasonable, unnatural, or otherwise, the nearness or remoteness of his relatives, the presence or absence of natural claims upon the testator's estate, and such other matters as are usually narrated in instructions of this character. Much stress is placed by counsel for contestants in argument upon the failure of the testator to devise some of his property to his brother James, or to members of his family. Just what prompted the testator to give all of his estate to his nephew John Hindert is

not, of course, disclosed by the evidence. He did say to one of the witnesses, who was present when the will was executed, that Hindert was the only person that ever did anything for him. The profession of James Shields, being that of a gambler, may have influenced him to some extent. The will is not so unnatural and unreasonable in its terms as to have called for a further or more elaborate instruction on this point, at least in the absence of a request therefor. The brother Tom had made rather substantial provision for the children of James, and also for their mother; and this, if known to the deceased, may also have had its effect upon him.

VII. The court, in Paragraph 7 of its charge, instructed the jury that it was its duty to consider the testimony of the doctors, as well as that of nonexpert witnesses, together with all the other evidence, and to give it such weight, be it large or small, as the jurors believed it entitled to; but that they were not bound in their deliberations thereby. This instruction is in accordance with the general rule long prevailing in this state. *Bales v. Bales*, 164 Iowa 257; *Philpott v. Jones*, 164 Iowa 730; *In re Will of Overpeck*, 144 Iowa 400; *In re Estate of Law*, 158 Iowa 609.

The effect of the instruction was not to withdraw the testimony of any witness, as claimed by appellants; but, on the contrary, it specifically told the jury that all of the evidence, expert and nonexpert, must be considered by them. The weight and value to be given to opinion evidence was peculiarly within the sound judgment and discretion of the jury. It could not be ignored, but it was not conclusive upon the jury, and was only to be considered with all other evidence in the case bearing upon the issue of testamentary capacity.

The remaining propositions discussed by counsel are either disposed of by what is said above or do not merit more particular consideration.—*Affirmed*.

ALBERT, C. J., and DE GRAFF, MORLING, and WAGNER, JJ., concur.