# PAUL V. WEBBER, SPECIAL ADMINISTRATOR OF ESTATE OF JOHN J. BOYER, v. JAY H. SEYMOUR.[1]

February 8, 1952.

No. 35,586.

*Floyd V. Nichols* and *Robert C. Tuveson,* for appellant.
*Meighen, Knudson, Sturtz & Peterson,* for respondent.

[1]Reported in 51 N. W. (2d) 825.

FRANK T. GALLAGHER, JUSTICE.

Appeal from an order of the district court denying plaintiff's motion for a new trial.

This action was brought pursuant to M. S. A. 573.02 by the special administrator of the estate of John J. Boyer, referred to hereinafter as Boyer, against Jay H. Seymour to recover damages for the wrongful death of the former arising out of a collision between two motor vehicles. The collision occurred on August 4, 1949, at the intersection of county aid road No. 31 and a township road about three miles northeast of Conger in Freeborn county.

Boyer, accompanied by one Norris Tukua, was driving a Chevrolet pickup truck owned by Conger Cooperative Creamery Association in a northerly direction on road No. 31. Freda Seymour, wife of defendant, was driving her husband's 1948 Chevrolet coach, with his knowledge and consent, in an easterly direction on the township road. Both highways were gravel-surfaced. The county road, running north and south, was approximately 26 feet wide "from grass to grass," and the township road, running east and west, was about 20 feet in width. The drivers of both vehicles were killed, as well as a passenger in the Seymour car. A child riding in the latter car was injured.

The collision occurred about 2:30 p. m. It was a clear, sunny day, and "the roads were in very good condition," according to Russell H. Wulff, Freeborn county deputy sheriff. He said that the north-south road had some loose gravel and that the east-west road was smooth and not so heavily graveled as the other. He recalled that the main-traveled portion of the county road had two tracks down the center and that there was a slight windrow of gravel in the center of the road. It appears from the record that the north-south road was level for some distance on each side of the intersection, with the exception of depressions in the highway somewhat to the north and to the south of the intersection. According to Wulff's testimony, there was a "little dip" in the east-west road approximately 100 to 150 feet west of the intersection, with a slight incline in the road as it approached the intersection from

the west. The only traffic sign on any of the four approaches to the intersection was a school-zone sign on the south approach traveled by Boyer. Corn was growing in a field adjoining the southwest corner of the intersection. The cornfield was about 20 feet from the grass line nearest it on each of the intersecting roads. There was testimony to the effect that the corn was tasseled, but had not reached its full growth, and was probably a foot or two above the fence level. It was cut down shortly after the accident. In the northwest corner of the intersection was a rural schoolhouse, with outbuildings and trees in the background. The roads were dry, with considerable dust rising therefrom, particularly on the county road when vehicles were using it. The wind was from the south. There was testimony that the movement of the truck on the highway created considerable dust as it approached the intersection.

The truck and car collided in the intersection and came to rest more or less side by side in a ditch adjacent to the northeast corner of the intersection. They were upside down, facing in a southeasterly direction, with the car up against a light or telephone pole in the northeast corner.

The testimony as to the speed of the vehicles as they approached the intersection was somewhat vague. The only eyewitness to the collision was Norris Tukua, a creamery operator or buttermaker at Conger, who was riding with Boyer at the time of accident. He explained Boyer's general duties in connection with picking up milk and cream for the creamery from farmers within a radius of about 60 miles of Conger. On the afternoon of the day of the collision, Tukua accompanied Boyer to Armstrong for the purpose of using a machine at the latter place to test the moisture content of some butter which had been prepared for a county fair exhibit. Tukua said that he and Boyer, who lived at his home during the work week, had been up since about four o'clock in the morning; that Boyer was familiar with the road, the intersection, and the cornfield, since he had traveled the highway weekdays for many weeks prior to the day of the collision in connection with his duties on the milk and cream route. He explained that Boyer usually

left the creamery about 7:15 in the morning, covered the 60-mile route, and returned to the creamery with the supplies around 11 a. m. After completing their routine duties at the creamery on the day of the accident, they left in the creamery truck around 2:30 in the afternoon on the trip to Armstrong, with Boyer driving. Tukua admitted that they were in a hurry to get there before the creamery closed. While Tukua's testimony was punctuated generally with many uncertainties, such as "I have never paid any attention to it," "I suppose," "I imagine," "I don't know," and "I just surmised," he did estimate that the truck in which he was riding was traveling about 55 miles an hour and that defendant's car as it approached the intersection was traveling about 45 miles an hour. On cross-examination, Tukua admitted that any estimate of speed which he made as to the car would be merely a guess. Estimates of speed, especially if made by occupants of moving vehicles, even when danger is not imminent, are not in themselves to be regarded as conclusive. Ranum v. Swenson, 220 Minn. 170, 19 N. W. (2d) 327. Tukua said that he was sitting on the right side of the driver; that because of an eye impairment he had no vision in his left eye; and he agreed on cross-examination that he was probably half asleep as they drove down the highway.

Tukua testified on direct examination that as they approached the intersection he saw defendant's car coming across the road. He was indefinite as to just where the car was when he first observed it and said that the truck in which he was riding was also close to the corner at that time. It is difficult to determine from his testimony just where on the highway defendant's car was when he first observed it. For example, he testified:

"Q. Well, where was the automobile when you first saw it?
"A. Right about in here some place.
"Q. About that fence line?
"A. Right up in here just going across.
"Q. Just coming out from behind the corn?
"A. Coming on the road.
"Q. It was on your road?

"A. I couldn't definitely say but I just seen the car about the time we went up to that—

"Q. You were right close to the corner then too?

"A. Oh, yes.

"Q. When you saw that car did you make any statement, or did you say anything to John?

"A. If I remember right I said, I don't think they are going to stop; about that fast we—

"Q. How long was it after that that the accident occurred?

"A. About the same time, practically."

On cross-examination, when asked whether it was not true that when the creamery truck was some little distance south of the intersection he saw defendant's car enter the intersection and that he called Boyer's attention to the fact that it was not going to stop, Tukua answered "Yes." He also said that he did not know how far south of the intersection the truck was at that time and that he did not know whether Boyer saw defendant's car. Tukua was then asked:

"Q. The point is you were some little distance south of the intersection when you made that statement to John [Boyer]?

"A. I suppose we were; we would have to be.

"Q. And at that time the Seymour car was actually into the intersection?

"A. Well, not quite.

"Q. And did you see the Seymour car prior to its entering the intersection?

"A. No."

When questioned further on cross-examination as to whether defendant's car stopped at a point back of the actual intersection, the witness answered that he did not know, but "they looked like they were going quite fast so they couldn't hardly have stopped." It is obvious that Tukua's testimony as to whether defendant's car was in the intersection first was very vague and indefinite. In any event, it appears that only one or two seconds elapsed between the

time Tukua first observed defendant's car and the time of the collision.

Defendant offered the testimony of the drivers of two automobiles going south on road No. 31 to the effect that the truck was going quite fast and that it created quite a cloud of dust. These automobiles met the creamery truck 110 or 120 rods south of the intersection. One of the witnesses, Henry Steele, said that the truck was on its right side of the road when he met it.

The trial judge charged the jury with his usual thoroughness, reading into his charge M. S. A. 169.14 with reference to speed restrictions and speed limits; § 169.18 with reference to the requirement that a vehicle shall be driven on the right half of the roadway upon all roads of sufficient width; and § 169.20, subd. 1, which provides in part:

"The driver of a vehicle approaching an intersection shall yield the right of way to a vehicle which has entered the intersection from a different highway.

"When two vehicles enter an intersection from different highways at approximately the same time the driver of the vehicle on the left shall yield the right of way to the vehicle on the right.

\*    \*    \*    \*    \*

"The driver of any vehicle or street car traveling at an unlawful speed shall forfeit any right of way which he might otherwise have hereunder."

The court in its charge explained the provisions contained in the first and second sentences of § 169.20, subd. 1, as set out in Moore v. Kujath, 225 Minn. 107, 112, 29 N. W. (2d) 883, 886, 175 A. L. R. 1007, where this court said:

"Obviously, both of the foregoing sentences were placed in the statute by the legislature in an endeavor to promote safety on the highways, and they should be so interpreted. As we view the two sentences, the second one so modifies the first as to require the driver on the left, even though he may reach the intersection first, to yield the right of way to the driver on the right in a situation

where the two vehicles would collide were each to continue its course and maintain its rate of speed. To otherwise interpret the law and to arbitrarily give to him who first enters the intersection the right of way over another vehicle approaching at approximately the same time from the right would be to increase rather than diminish the hazards of driving. By *approximately*, the legislature must have meant the approach to an intersection of two vehicles so nearly at the same time that there would be imminent hazard of a collision if both continued the same course at the same speed. In that case, he on the left should yield to him on the right. While the driver on the left is not required to come to a dead stop, as at a through highway stop sign, unless it is necessary to avoid a collision, he nevertheless must approach the intersection with his car so under control that he can yield the right of way to a vehicle within the danger zone on the right. Such must have been the legislative intent."[2]

The court then properly told the jury that the above rule must be applied in the light of all existing circumstances in each and every case where it is in effect. See, Ranum v. Swenson, 220 Minn. 170, 19 N. W. (2d) 327, in which this court rejected the policy of applying arbitrary standards of behavior amounting in effect to rules of law, unless the surrounding circumstances were taken into consideration. In discussing some of the surrounding circumstances required to be considered, this court, in Moore v. Kujath, *supra,* included speed of cars involved, the weather, highway obstructions, contour of the surrounding land, and condition of the highway.

The trial court then explained to the jury that the case was "bottomed upon negligence" and said:

"The first question is, was the defendant, and that means the defendant's driver or operator of his automobile, negligent and careless, as claimed on the part of plaintiff, and second, if there was

---

[2]See, also, Foster v. Bock, 229 Minn. 428, 39 N. W. (2d) 862, and Mattfeld v. Nester, 226 Minn. 106, 32 N. W. (2d) 291, 3 A. L. R. (2d) 909, in which the rule of the Moore case was applied.

negligence and carelessness on the part of defendant, was this negligence the proximate cause of the accident, the direct and proximate cause of it, and the resulting death which followed from the collision, for which plaintiff now seeks damages under the death by wrongful act statute, and third, was the plaintiff's decedent, John J. Boyer, guilty of any negligence himself which proximately and in some degree contributed to the accident as a cause; by that I mean, the third question is, was the plaintiff's decedent, Boyer, guilty of any negligence as a proximate cause of the accident."

The court defined the terms "negligence," "contributory negligence," and "proximate cause" in clear and understandable language. No objections were taken by either party to the charge. The court then submitted two forms of verdict for the consideration of the jury. One form read as follows:

"We the jury in the above entitled action find for the plaintiff and assess his damages in the sum of blank dollars."

The other read:

"We the jury in the above entitled action find for the defendant, no cause of action."

After retiring, the jury returned for further instructions. When questioned by the court as to whether there was some point which was not clear, the foreman said:

"Yes, there is, as to the matter, we are to vote on the party negligent or the party not negligent or both?"

When the court asked whether the jury was "troubled about whether there was negligence at the intersection," the foreman said "No," and explained that the jury wanted to know, "If we can vote on the negligence or not negligent on the both parties at once in one ballot." The court then attempted to clarify the matter by reiterating in substance the points outlined in its charge with reference to the negligence of the driver of defendant's car and the contributory negligence of Boyer. The jury returned a verdict "for the defendant, no cause of action," as in the form submitted above.

Plaintiff moved to set aside the verdict and for a new trial on the ground that the verdict was contrary to law and the evidence; that the court erred in denying his motion for a directed verdict and in submitting the question of plaintiff's contributory negligence; on the further ground of errors of law occurring at the trial; and that the verdict was the result of passion and prejudice. The motion was denied.

Plaintiff argues that apparently from the request of the jury for additional instructions and the subsequent verdict it found the drivers of both cars guilty of negligence. Defendant contends that it was apparent from the conduct of the jury that it found the driver of defendant's car negligent, and, having done so, that the result was the same as though the court had instructed the jury that defendant was negligent as a matter of law. He claims, therefore, that failure to give such an instruction thereby became harmless error, with no resulting prejudice to plaintiff.

We are unable to determine here whether the jury decided that the driver of defendant's car was negligent and that Boyer was also guilty of contributory negligence, and thus returned a verdict for defendant, or whether it determined that the driver of defendant's car was not negligent, but that Boyer was guilty of contributory negligence.

While it may always be a question as to the exact instant when each vehicle entered the intersection, or as to which car entered first, it is obvious that both vehicles approached the intersection at approximately the same time and that there was imminent danger of a collision if both continued the same course at the same speed. This is evident from the fact that the collision occurred in a comparatively small intersection, approximately 20 by 26 feet. Even though the driver of defendant's car reached the intersection an instant or two before the truck, she was required to yield the right of way to the driver on the right in a situation such as existed here, where a collision was imminent if both vehicles were to continue the same course and maintain the same rate of speed. Under these circumstances, it is our opinion that the

jury should have been instructed that the driver of defendant's car was negligent as a matter of law.

We consider the obvious physical circumstances here, so far as the driver of defendant's car was concerned, as different from those in Ristau v. Riley, 230 Minn. 341, 41 N. W. (2d) 772, where the evidence was conflicting as to the facts determinative of which driver had the right of way. That being true, this court held in that case that whether one driver or the other was negligent and whether such negligence was the proximate cause of the collision were fact questions for the jury.

See, also, Mattfeld v. Nester, 226 Minn. 106, 32 N. W. (2d) 291, 3 A. L. R. (2d) 909, in which it was held that it is the duty of the driver of an automobile approaching from the left to yield the right of way to one approaching from the right where they approach an intersection under such circumstances that if both continue at the speeds at which they are traveling a collision is likely to occur; and that an automobile approaching an intersection from the right is required to yield the right of way to one approaching from the left which has reached the intersection an appreciable length of time ahead of it and is in actual possession of the intersection. In the case at bar, it is evident that the automobile approaching from the left could not have reached the intersection an appreciable length of time ahead of the one approaching from the right so that it could be said that the driver on the left had actual possession of the intersection.

While the driver of defendant's car was not required to come to a complete stop, as at a through-highway stop sign, unless it was necessary in order to avoid a collision, she was required to approach the intersection, taking into consideration all the surrounding circumstances, including the cornfield obstruction, speed of the cars involved, and condition of the highway, so that she could yield the right of way to a vehicle within the danger zone on the right. It is self-evident that the purpose of the law, as intended by the legislature, was to reduce the possibility of accidents at intersections; and if we were to say that any driver approaching an

intersection from the left who happened to enter an intersection first, no matter how short the time, automatically had the right of way over another vehicle approaching at approximately the same time from the right, and within the danger zone, it would tend to increase intersection hazards rather than reduce them. Moore v. Kujath, 225 Minn. 107, 29 N. W. (2d) 883.

■ While it appears from the facts and circumstances here that Boyer had the right of way, this did not relieve him of the duty of exercising due care as he approached the intersection. The issue of his contributory negligence was for the jury to determine. See, Thorstad v. Doyle, 199 Minn. 543, 273 N. W. 255, and cases cited therein; 4 Dunnell, Dig. & Supp. § 7012, and cases under notes 37, 38, and 39.

In view of the situation, it is our opinion that the case should be remanded for a new trial on the sole issue of the contributory negligence of Boyer, the driver of the truck.

Reversed and new trial granted.