## EDWARD W. JOHNSON AND ANOTHER v. SOREN AGERBECK AND ANOTHER.

77 N. W. (2d) 539.

June 8, 1956—No. 36,611.

*Erickson & Zierke,* for appellants.
*Seifert, Johnson & Hand,* for respondents.

NELSON, JUSTICE.

This is an appeal from an order denying defendants' motion for amended findings or for a new trial. The court below found plaintiffs entitled to a permanent injunction and thereby entitled to a mandatory injunction of the court compelling defendants to forthwith fill up a ditch on their land and on the adjacent public right-of-way. The matter was submitted to the court on all issues.

The questions involved in the main are whether the evidence sustains a finding that defendants unreasonably caused surface waters to flow in increased volume onto the plaintiffs' land contrary to the rule applicable to the disposition of surface waters in this state, based upon undisputed engineering and survey data made a part of the record; and whether the evidence sustains the findings in plaintiffs' favor and the issuance of a mandatory injunction.

It appears that the plaintiffs are the owners of the S 1/2 of the NE 1/4 and the NE 1/4 of the NE 1/4 sec. 33, T. 101 N., R. 33 W.,

fifth principal meridian, Martin County, Minnesota, and the defendants are owners and tenants of the SW 1/4 and the S 1/2 of the NW 1/4 sec.33, T.101 N., R.33, in Martin County, Minnesota. Defendants' land is located just west and across a north-south township road from the land owned by the plaintiffs. The contour of the land belonging to the litigants is such that during heavy rainfall the natural surface waters flow from a slough on the westerly portion of defendants' land easterly through a culvert underneath the surface of and traversing the north-south township road between the lands of the parties, in an easterly direction onto the land of the plaintiffs. A shallow swale or ditch runs from the slough on defendants' land in an easterly direction to the culvert in the road and from the east side of the culvert over the plaintiffs' land in a northeasterly direction. The location of this culvert is over the area of a public tile ditch system known and established as judicial ditch No. 10. The flow line through the culvert is higher than the natural surface of the land on either side in the area involved. It appears that it is only during wet periods that the surface waters build up sufficiently to pass through the culvert, the general surface waters otherwise draining through the tile ditch system.

The plaintiffs had been owners and occupants of the land for some 54 years until shortly before the present litigation. The defendant Soren Agerbeck had purchased the defendants' land in 1932, had occupied it himself until 5 or 6 years ago, after which time his son took over as a tenant. When the Agerbeck land was purchased, an old bull or open ditch ran easterly on the land toward the culvert. It was thereafter plowed shut except for a distance of about 20 feet westerly from the culvert, the defendants claiming that this was necessary in order to move machinery across and better farm the land and to permit the water in wet seasons to flow through the culvert. This left a natural swale or watercourse through the defendants' land. There was testimony that defendants had left a furrow in plowing along the swale on their land. At times, due to the contour of the land, silt and dirt washed into the ditch area or swale near the culvert. This the defendants for a number of years removed

from the swale in order to keep the approach to the culvert open and to facilitate farming operations. The moving and scraping of this gathered dirt and silt extended through the defendants' fence onto the road right-of-way and into the road ditch to the west of the culvert. The plaintiffs claim that the defendants' scraping and digging for the purpose of removing this dirt and silt from time to time went below the natural surface depth and was the cause of damage to their land by reason of causing surface waters to precipitate and flow upon their land in increased volume from the west to the east and in an unreasonable manner. An overall examination of the testimony and the exhibits definitely establishes that only a limited and shallow natural waterway or swale existed. It is plain from the evidence that any alleged losses sustained by the plaintiffs due to overflow of surface waters had their inception in wet years or in periods of heavy rainfall and that very little crops if any were lost directly east of the culvert upon the plaintiffs' land.

Plaintiff makes the claim that an increased flow of surface waters due to scraping and digging in the ditch or swale on defendants' land to the west of the culvert was the direct cause of a crop loss to him of 3 acres of corn in one of the preceding years; that top soil was washed away; and that the flow of surface waters in amounts larger than normal washed away top soil and left ditches upon his land. This appeared to be in an area to the south and some distance from the swale. His evidence was mostly confined to the years beginning in 1951 and running through part of 1953. The testimony indicates that 1951 and 1953 were wet, in fact years of heavy rainfall, and that surface waters gathered in more than the normal volume of other years.

The evidence indicates that the defendants lost upwards of 30 acres to farming in the slough area to the west of the plaintiffs' land in the wet seasons when heavy rains fell and abnormal surface waters were encountered. Plaintiffs introduced no engineering testimony and no maps. All testimony with reference to swales, ditches, and alleged scraping and digging by defendants on their own land in proximity of the culvert to the west was produced by way of observation and mere estimates as to depth and width and general

contour on the part of the plaintiffs and members of the township board who appeared as witnesses in their behalf. The pictures introduced as exhibits clearly fail to indicate anything beyond a shallow natural waterway or swale. Defendant furnished engineering and surveyor testimony and map surveys showing measurements and elevations for a considerable distance to the east and the west of the road and culvert area.

It appears from the elevations taken that on plaintiffs' land between the easterly flow line of the culvert and the easterly low swale elevation taken on plaintiffs' land the elevation is 2.72 feet from east to west, the said flow line of the culvert being 99.72 and the easterly elevation 97.0. The culvert through the road furnishes the high point of elevation in the area.

On defendants' land, the engineering survey which the defendants introduced clearly indicates that from the edge of the field where slough water was likely to be found in wet periods to the flow line of the culvert to the east toward plaintiffs' land there was an elevation of 3.2 feet. In fact the measurements disclose that the elevation of the slough area, at the edge of the field on the fence line, was at a lower elevation than the point on the plaintiffs' land along the swale area equidistant from the culvert.

The engineering and surveyors' measurements and elevations taken beginning at the bottom edge of the culvert on the west side thereof fixing that elevation at 100, proceeding westerly through the low surface area and swale on the defendants' land toward the slough, as presented by maps and survey disclose the following data: First elevation at bottom of ditch or swale 50 feet west of road center on defendants' land reads 98.1; proceeding westerly, away from the culvert, in the low swale area at approximately equidistant points the low swale elevations read 97.6, 97.3, 97.1, and 96.8 ending at a fence line to the east of the slough area on defendants' land. Measurements were taken to points 50 feet north of the said low point swale elevations. Beginning 50 feet west of road center, these elevations, proceeding westerly to the said fence line, read 99.1, 98.0, 98.0, 97.2, and 97.3. Repeating elevations at points 50 feet south of the

elevations in the swale area, these from the easterly point to the westerly at the fence line read 99.2, 99.0, 97.8, 98.6, and 97.3.

Going easterly, away from the culvert, on plaintiffs' land beginning at the low point in the swale area 50 feet from the road center the first elevation is 98.5, the next easterly 97.6, and the most easterly taken 97.0. Those taken 50 feet to the north of the low swale elevations from west to east read 98.8, 98.5, and 98.7. Those taken 50 feet to the south of the elevation in the swale, from west to east, read 99.1, 98.4, and 97.7.

The chief witness as civil and highway engineer called by defendant was Frank O. Jones of Fairmont, Minnesota. His qualifications were conceded. Another civil engineer, Ray Herrick, had made the survey, taking measurements and elevations under the supervision of Jones. Herrick testified that he was also a registered highway engineer and land surveyor in the State of Minnesota engaged in general surveying and engineering work since 1917 and an assistant to Jones since January 1946.

█ It is clear from the record that we are concerned here only with surface waters. The plaintiffs cite the case of Enderson v. Kelehan, 226 Minn. 163, 32 N. W. (2d) 286, as controlling as to the disposition of surface waters. Defendants rely upon the well-known rule as to the disposition of surface waters enunciated in Sheehan v. Flynn, 59 Minn. 436, 61 N. W. 462, 26 L. R. A. 632, and also rely upon and cite Enderson v. Kelehan, *supra,* as authority for their position due to their claim that the Enderson case presents facts similar to those in the instant case. They rely upon the statement in the case of Sheehan v. Flynn, *supra,* generally, to the effect that the old common-law rule that surface water is a common enemy which each owner may get rid of as best he can is in force in this state, except that it is modified by another rule which is that he must so use his own land as not to unnecessarily or unreasonably injure his neighbor. They argue that that is the rule in force in this state. Defendants, however, recognize that under this early rule it is the duty of an owner draining his own land to dispose of the surface waters in some natural drain, and he may do so even though it is

thereby conveyed upon the land of his neighbor if he does not thereby unreasonably injure his neighbor, and that the circumstance to be considered in determining what is a reasonable use of one's own land under this rule is the amount of benefit to his estate thus drained as compared with the amount of injury to his neighbor's estate by reason of casting the burden of the surface waters upon it.

Defendants take the position that if they act within the limitations and the rule enunciated in Sheehan v. Flynn, *supra*, and do what is reasonable to dispose of the surface waters to the least injury of the adjoining land of his neighbor, they have a right to drain their land for a proper use and cast the water upon the neighbor's land, whether such drainage is the direct and sole purpose of the improvement or only results incidentally therefrom.[1]

In relying upon the Enderson case, defendants quote the following statement to sustain their position (226 Minn. 169, 32 N. W. [2d] 290):

"* * * In fact, the apparently unusual increase of water in plaintiff's natural catch basin, on the evidence adduced, could reasonably be attributed to *abnormally wet seasons* involving extremely heavy falls of snow and rain. We have the further factor that the inundated area was normally used and suited for *pasture land*, and that a flooding thereof was by no means as harmful and lasting as in the case of farm land requiring early and regular tillage. In other words, any harm to plaintiff's land was of little gravity in comparison to the benefit accruing to defendant's acreage. We note also that defendant in constructing the ditches substantially *followed the natural course of drainage*. In the apt words of the trial court, '* * * the ditching the defendant did upon his * * * land amounted merely to aiding the natural drainage of the waters accumulating in * * * small sloughs or potholes on his said farm during seasons of excessive rainfall and snowfall.' The *elevation data* supports this conclusion. With respect to the small area in the northwest corner of defendant's land, possibly it could have been drained to the north, but on the whole the surface waters there involved were too insignifi-

---

[1]See, 6 Dunnell, Dig. & Supp. § 10165.

cant to justify, as a practical matter, a separate course of drainage. Plaintiff contends, however that in constructing the ditches defendant cut across certain ridges or water barriers. The evidence leads us to a contrary conclusion, in keeping with the trial court's findings. *What plaintiff calls ridges appear to be nothing more than the natural land elevation which normally separates one low spot from another. Obviously, no drainage could ever be effected unless the rims surrounding low spots could be cut, with due regard, of course, to the slope of the land as a whole.*" (Italics supplied.)

Surface waters have been defined in Hartle v. Neighbauer, 142 Minn. 438, 172 N. W. 498, as consisting of waters from rain or melting snow which lie or flow on the surface of the earth, but which do not form part of a well-defined body of water or natural watercourse. They do not lose their character as surface waters merely because in a measure they are absorbed by or soaked into the marshy or boggy ground where collected. In the Enderson case, Mr. Justice Matson, speaking for the court, states that Minnesota has evolved the rule of reasonable use and follows neither the rule of the common law nor that of the civil law; that this rule obviously has attained a distinct and independent status; that the rule, as promulgated in Sheehan v. Flynn, *supra*, and as amplified by subsequent decisions, permits that, in effecting a reasonable use of his land for a legitimate purpose, a landowner, acting in good faith, may drain his land of surface waters and cast them as a burden upon the land of another, or adjacent landowner, although such drainage carries with it some waters which would otherwise have never gone that way, but would have remained on the land until they were absorbed by the soil or evaporated in the air, provided the landowner gives heed to existing and surrounding circumstances, and, if

(a) There is a reasonable necessity for such drainage;

(b) If reasonable care be taken to avoid unnecessary injury to the land receiving the burden;

440

(c) If the utility or benefit accruing to the land drained reasonably outweighs the gravity of the harm resulting to the land receiving the burden; and

(d) If, where practicable, it is accomplished by reasonably improving and aiding the normal and natural system of drainage according to its reasonable carrying capacity, *or* if, in the absence of a practicable natural drain, a reasonable and feasible artificial drainage system is adopted.[2]

It should be noted in considering the facts in this controversy that the defendants' 240 acres of land as well as the plaintiffs' land constitute a part of the public drainage system of Martin County, Minnesota, known as judicial ditch No. 10 and that the lands involved were originally assessed for benefits in connection therewith, and that the culvert in question was placed where it is located for drainage purposes and as an adjunct of that drainage system in connection with the road construction. It must also be taken into account that any person living upon or owning land fronting on a public rural highway, to the extent of the portion which is not in actual use or needed for public travel, may plow, level, and seed the same to grass, except within one rod of the center. In doing this, however, he must not interfere with the public travel upon the road or the improvements of the same; neither will he be entitled to compensation therefor or acquire title to any portion of the road thereby. M. S. A. 160.27.[3] The defendants here were not without right to level ridges or move gathered silt within that area if the same constituted an interference with a natural approach to the culvert here, even though its bottom occupied higher ground than the swale area to the west upon the defendants' land.

■ In applying the rule as to what is reasonable use in connection with the disposition of surface waters, all questions of fact must be resolved according to the special circumstances of each particular case.

---

[2]See, Praught v. Bukosky, 116 Minn. 206, 133 N. W. 564; Bush v. City of Rochester, 191 Minn. 591, 255 N. W. 256.

[3]See, Opinion Attorney General, No. 377-B-10-j, April 10, 1951.

While there may be some conflict in the evidence in the case at bar concerning the slope of the land both to the east and to the west of the culvert, it must be taken into account that such evidence is based entirely upon observation and upon estimates. As to measurements and elevations shown by the survey of the engineers in this case, there is no dispute; and the testimony made only from estimates and observation must give way to the undisputed engineering data of the survey furnished and made available as evidence by defendants. Larsen v. N. P. Ry. Co. 185 Minn. 313, 241 N. W. 312.

It is a matter of common knowledge that water seeks its own level. While water does seek its own level, it will not flow uphill. It is clear from the testimony in the case at bar and conceded by both sides that surface waters passed through the culvert onto the plaintiffs' land during wet seasons or in times of heavy rains. The plaintiff admitted in his testimony of his willingness to take such overflow. Obviously, in view of the elevation of the land as disclosed by the survey, no more than the overflow passed through the culvert onto plaintiffs' land.

■ Engineer Jones, a defendants' witness, was asked his opinion on whether defendants' digging would increase the flow of surface water from the defendants' farm east onto the plaintiffs' farm. Plaintiffs objected and were overruled. Foundation for the question was laid in the facts of elevation which were found as a result of the survey. It cannot well be refuted that one who is a civil engineer by profession and thoroughly grounded as a land surveyor, and particularly in drainage, would be qualified to offer an opinion on this subject. Plaintiffs objected on the basis of lack of observation, not on the basis of lack of experience or technical skill. The completion of the land survey was sufficient to overcome the objection to lack of observation and since there was no other objection, at least to engineer Herrick's testimony, the opinion was properly submitted. The objection to engineer Jones not being present during the whole time of the survey is without substance in view of his general supervision of the survey project.

The engineers testified on subjects concerning matters of science or specialized art. Land surveying and measurements as to eleva-

tion in the engineering field is a matter of specialized skill and of science. It involves, among other things, principles of mathematics, and no one doubts that mathematics is a science. Being on matters of science and there being no other evidence on elevation or as to measurements, the opinion evidence was conclusive on the questions involved. In the case of Moratzky v. Wirth, 74 Minn. 146, 148, 76 N. W. 1032, 1033, this court said:

"* * * The ordinary function of experts is to assist the jury, by their superior knowledge, in reaching a correct conclusion from the facts in testimony before them. Their opinions are not, as a rule, conclusive upon the jury, but mere items of evidence for the consideration of the jury. *But in a case where the evidence, and the facts to be deduced therefrom, are undisputed, and the case concerns a matter of science or specialized art or other matter, of which a layman can have no knowledge, the jury must base their conclusion upon the testimony of the experts.*" (Italics supplied.)

See, 7 Dunnell, Dig. (3 ed.) § 3334.

While expert testimony in the field of medicine is not conclusive, Robinson v. Butler, 234 Minn. 252, 48 N. W. (2d) 169; In re Will of Shields, 208 Iowa 607, 224 N. W. 69; nor in the field of value, State v. Wagner, 233 Minn. 241, 46 N. W. (2d) 676, 23 A. L. R. (2d) 762; nor speed, Webber v. Seymour, 236 Minn. 10, 51 N. W. (2d) 825, there is a different approach generally when we come to the cases which involve the subject of measurements and distances where such evidence may be and often is conclusive. We are governed by the latter rule in this case. See, Jacobson v. Camden, 236 Iowa 976, 20 N. W. (2d) 407; Brown v. Detroit United Ry. 216 Mich. 582, 185 N. W. 707; Van Dunk v. Chicago & N. W. Ry. Co. 188 Wis. 476, 206 N. W. 852; United States v. Hill (8 Cir.) 62 F. (2d) 1022.

The rule is very aptly set out in Annotation, 66 A. L. R. 1532, 1542, as follows:

"The testimony of disinterested and unimpeached witnesses on subjects like measurements and distances, which is based on memory or casual observation, and is at best only an estimate, is deprived

of all probative effect where there is evidence based on actual measurements."

Elevation is subject to exact determination through the use of surveying instruments. Examination of the exhibits indicates conformity to scientific standards.[4]

In view of the engineering testimony as to measurements, distances, and elevations which defendants produced and the survey which stands unimpeached, the testimony of plaintiff that defendants dug or ditched below the natural surface of their lands to the legal detriment of plaintiffs' lands is here without probative effect.

■ Although the expert engineers' opinion that the digging referred to in the testimony would not increase the flow of water would not be conclusive of the broad question whether there was unreasonable use of the land, nevertheless, that opinion, when coupled with the engineers' survey; its measurements and elevations; and all of the other evidence, indicates that the whole of the evidence, even if it be taken most favorable to the prevailing party, does not support the findings and the conclusions of the court below nor sustain the injunctive relief provided therein. The findings and the conclusions based thereon are manifestly and palpably contrary to the evidence, and there must be a reversal on all issues.

Reversed.

---

[4]See, Kress & Co. v. Sharp, 156 Miss. 693, 126 So. 650, 68 A. L. R. 167; In re Butt's Estate, 181 Wis. 141, 193 N. W. 988; Mann v. Phoenix Brick & Const. Co. 151 Mo. App. 586, 132 S. W. 19; Perkins v. Township of Delaware, 113 Mich. 377, 71 N. W. 643; Jones v. City of Detroit, 171 Mich. 608, 137 N. W. 513; Jacobson v. Milwaukee, 262 Wis. 256, 55 N. W. (2d) 1; Stryk v. Sydarowich, 198 Wis. 542, 224 N. W. 479; Bauch v. State Farm Mutual Auto. Ins. Co. 251 Wis. 489, 29 N. W. (2d) 494; City of Hazard v. Eversole, 237 Ky. 242, 35 S. W. (2d) 313; Kuntz v. City of Pittsburgh, 123 Pa. Super. 394, 187 A. 287; Moore v. Chicago, R. I. & P. Ry. Co. 151 Iowa 353, 131 N. W. 30.